# EXHIBIT A-1

11/4/2016 1:29:17 PM
Chris Daniel - District Clerk Harris County
Envelope No. 13629697
By: Bonisha Evans
Filed: 11/4/2016 1:29:17 PM

## 2016-76737 / Court: 157

### CAUSE NO. _____

| | | |
|---|---|---|
| INTERNATIONAL ENERGY | § | IN THE DISTRICT COURT OF |
| VENTURES MANAGEMENT, | § | |
| L.L.C. | § | |
| **Plaintiff** | § | |
| | § | |
| V. | § | HARRIS COUNTY, TEXAS |
| | § | |
| UNITED ENERGY GROUP | § | |
| LIMITED and SEAN MUELLER | § | |
| **Defendants** | § | _____ JUDICIAL DISTRICT |

### PLAINTIFF'S ORIGINAL PETITION
### AND APPLICATION TO COMPEL ARBITRATION

Certified Document Number: 72606317 - Page 1 of 41

# TABLE OF CONTENTS

Discovery Plan & Specific Statement of Relief...........................................................4

Nature of the Case ........................................................................................................4

Parties ...........................................................................................................................5

Jurisdiction and Venue .................................................................................................6

Facts ..............................................................................................................................7

    I.      Plaintiff IEVM is an oil and gas consulting firm with extensive expertise in the Pakistan oil and gas assets at issue in the BP sale.........................7

    II.    IEVM learned of the BP sale and hired Mueller to represent it in finding a new buyer. ........................................................................................10

    III.   UEG agrees to the finder's fee and consulting agreement with IEVM. ..............................................................................................................15

    IV.   Both IEVM and UEG begin performing under the finder's fee/consulting agreement, and UEG submits a preemptive bid for the assets. ............................................................................................................19

    V.    IEVM continues to perform consulting work during the due diligence phase of the deal, pursuant to the IEVM/UEG agreement....................23

    VI.   UEG closes on the deal in September 2011 and refuses to pay IEVM. ..............................................................................................................25

    VII.  Mueller likewise breached his retention agreement and other duties to IEVM. .......................................................................................................25

    VIII. IEVM and UEG enter into the Supplemental Agreement containing the arbitration clause at issue. .........................................................................28

    IX.   IEVM was thus forced to file suit and arbitration against UEG and Mueller in 2013..........................................................................................30

    X.     Procedural Matters Regarding Arbitration.............................................32

Causes of Action ........................................................................................................34

    I.      Cause of Action 1:   Application to Compel Arbitration Against UEG ......................................................................................................34

    II.    Cause of Action 2:  Breach of the Retention Agreement by Mueller...................35

Certified Document Number: 72606317 - Page 2 of 41

III.    Cause of Action 3:  Breach of Fiduciary Duty (against Mueller).........................35

IV.    Cause of Action 4: Misappropriation of Trade Secrets (pleaded in the alternative as to Mueller) ................................................................37

V.    Cause of Action 5:  Attorneys' Fees, Expenses, and Costs of Court (against Mueller)................................................................................38

Damages and Other Relief Requested ...........................................................39

Conditions Precedent and Notice ...................................................................40

Tolling of Limitations ....................................................................................40

Demand for Jury Trial....................................................................................40

General and Special Prayers for Relief...........................................................41

## EXHIBITS

1.    Arbitration Agreement
2.    Draft UEG/IEVM finder's fee/consulting agreement
3.    Sept. 18, 2010 Email from Tom Moore of Dewey & LeBoeuf
4.    UEG Sept. 7, 2010 Letter to BP
5.    UEG Sept. 20, 2010 Letter to BP
6.    UEG business cards issued to IEVM
7.    Affidavit of Graham B. Livesey

## PLAINTIFF'S ORIGINAL PETITION
## AND APPLICATION TO COMPEL ARBITRATION

**COMES NOW** Plaintiff International Energy Ventures Management, LLC ("IEVM" or "Plaintiff") and files this Original Petition and Application to Compel Arbitration against Defendants United Energy Group, Ltd. (Limited) ("UEG") and Sean Mueller.   IEVM respectfully shows the Court as follows:

### Discovery Plan & Specific Statement of Relief

1.       IEVM intends that discovery be conducted under Level 2, to the extent applicable. IEVM affirmatively pleads that this suit is not governed by the expedited actions process in TEX. R. CIV. P. 169 because this case does not fall within the scope of TEX. R. CIV. P. 169(a).

2.       Specific statement of relief:  Pursuant to TEX. R. CIV. P. 47(c), IEVM seeks monetary relief over $1,000,000.  IEVM also seeks nonmonetary relief in the form of an order compelling UEG to arbitration.  IEVM further seeks all other relief to which it deems itself entitled.

### Nature of the Case

3.       This case arises out of the sale of oil and gas assets in Pakistan from BP to defendant UEG.

4.       IEVM is a Houston oil and gas consulting firm.  IEVM's members have over 30 years of experience in the *very BP assets being sold*.  IEVM previously did extensive work on these properties for Texas Union Petroleum, Orient Petroleum, and BowEnergy Resources, prior owners of the Pakistan assets, as detailed below.  Indeed, it is highly unlikely that any consulting firm had more expertise in these assets than IEVM.

5.       IEVM retained defendant Sean Mueller, a Houston investment banker, to represent IEVM in finding a buyer for the Pakistan assets and to negotiate the compensation paid

Certified Document Number: 72606317 - Page 4 of 41

to IEVM by the buyer.

6.      IEVM and Mueller proceeded to find a buyer for the BP Pakistan assets, Chinese defendant UEG.  UEG agreed, *inter alia*: (1) to pay IEVM a 2% equity interest in the deal; (2) to hire IEVM as employees to manage the Pakistan assets after the deal closed; (3) to pay IEVM a small consulting fee of $62,500 per month from January 2011 to closing; and (4) to pay IEVM's out of pocket expenses.

7.      IEVM fully performed under both these agreements.  But UEG and Mueller each breached their separate agreements with IEVM.  *UEG even admitted its breach in writing in a fully signed supplemental agreement with IEVM*, attached as Exhibit 1.

8.      IEVM now sues: (1) to compel UEG to arbitrate IEVM's claims against it; and (2) for damages and other relief against Mueller for breach of his separate agreement with IEVM and for related claims.

### Parties

9.      Plaintiff IEVM is a limited liability company organized under the laws of the State of Texas.  Plaintiff IEVM is a resident of, *inter alia*, Texas.  Its three members are Michael S. ("Mick") Francisco, Graham B. Livesey, and Lapadanco, Inc.  All members are residents of, *inter alia*, Harris County, Texas.   Plaintiff has standing and capacity to file suit.

10.      Defendant United Energy Group, Ltd. ("UEG") is a limited liability company organized under the laws of Bermuda.   UEG's principal place of business is at Two Pacific Place, 88 Queensway, Hong Kong.   UEG may be served with process at that address or through the Bermuda Central Authority, pursuant to the procedures of The Hague Convention, the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.  UEG is being sued in its capacity as a business entity.  Upon information

Certified Document Number: 72606317 - Page 5 of 41

and belief, UEG is a resident of Bermuda and/or the United Kingdom, and Hong Kong and/or China.

11.     Defendant Sean Mueller is an individual residing in Harris County, Texas.  He is being sued in his individual capacity and is a resident of Texas.  He may be served with process at 20 Crestwood Drive, Houston, Texas 77007 or where he may be found.

12.     The correct Defendants are being sued in their correct capacities.

### Jurisdiction and Venue

13.     This Court has subject matter jurisdiction.  This Court has jurisdiction over the subject matter of the suit, and the amount in controversy is within the jurisdictional limits of this Court.  As set forth above, IEVM seeks over $1 million in damages as to Mueller.

14.     Also, among other things, this Court has jurisdiction over this Application to Compel Arbitration pursuant to, *inter alia*, TEX. CIV. PRAC. & REM. CODE § 171.081.

15.     This Court has personal jurisdiction over Defendant UEG because UEG agreed to arbitrate the instant dispute with IEVM in Texas.  This Court therefore has personal jurisdiction over UEG for the purpose of compelling arbitration.  The arbitration agreement between the parties is "governed by and interpreted by the laws of the state of Texas," and provides that "[a]ny controversies arising out of this Agreement or its interpretation shall be settled by a single arbitrator in Houston, Texas".  Exh. 1 at 3.

16.     This Court has personal jurisdiction over Defendant Mueller because he is a resident of Texas.

17.     Venue is proper in this Court.  The contract between UEG and IEVM provides for arbitration in Houston, Texas; Defendant Mueller is a resident of Harris County and may be

served with process in Texas; and a substantial part of the events at issue occurred in Harris County.

**Facts**

**I.     Plaintiff IEVM is an oil and gas consulting firm with extensive expertise in the Pakistan oil and gas assets at issue in the BP sale.**

18.     Plaintiff IEVM is a Houston oil and gas consulting firm.  Its principals are three engineers/geologists: Daniel W. Hughes,[1] Graham B. Livesey, and Michael S. ("Mick") Francisco.  Each one has over 30 years of experience worldwide in major petroleum systems, on both the technical and the business sides.

19.     IEVM has extensive experience—going back to 1982—on the very Pakistan assets at issue in the BP sale.  It is highly likely that IEVM had more experience with these assets than any other consulting firm in the world.

20.     IEVM's principals are the former senior technical managers of some of the BP Pakistan assets.  IEVM's principals worked for Union Texas Petroleum and the Orient Petroleum Group (Orient Petroleum and then BowEnergy Resources) before BP acquired these assets in 2000.  IEVM's principals were largely responsible for the 45% exploration drilling success rate achieved on those assets and believed that substantial additional oil and gas reserves could be achieved.

21.     From 1982 to 1998, Mick Francisco worked with Union Texas Petroleum on several assignments, including in Pakistan.  He also held senior positions with Energy Managers International, where he managed and supervised drilling and production operations and engineering, workovers, and facilities and infrastructure projects for Orient Petroleum in Pakistan (part of the BP Pakistan assets), as well as other locations.

---

[1]     Hughes is President of IEVM member Lapadanco, Inc.

Certified Document Number: 72606317 - Page 7 of 41

22.     From 1992 to 1998, Dan Hughes worked for Union Texas Petroleum.  He was the first to recommend acquisition of extensive 3-D seismic surveys in Badin (part of the Pakistan assets) to define additional development locations within fields that had only 2-D seismic data.

23.     From 2000 to 2005, Hughes was the Vice President, Exploration for the Orient Petroleum Group (Orient Petroleum and then BowEnergy Resources), where he was instrumental in developing and managing a worldwide portfolio of exploration and development projects, including a highly successful exploration and development program in Pakistan.   Hughes managed a 19 commitment well exploration program in the Mirpur Khas and Khipro blocks (part of the BP Pakistan assets) for Orient Petroleum and later for BowEnergy Resources.   His exploration program discovered 7 gas fields and 2 oil fields, with reserves estimated to be 260 billion cubic feet of gas and 10 million barrels of oil.

24.     Graham Livesey joined Orient Petroleum in 2000.  In 2001, he became President of BowEnergy Resources, Orient's partner in Pakistan.   He was largely responsible for evaluating and arranging financing for the acquisition of the interest in the Badin concession—a bid that was ultimately topped by BP.  Livesey remained as President of BowEnergy Resources until June 2009 and oversaw the exploration and development of the Mirpur Khas and Khipro blocks, now operated by BP and part of the assets for sale.

25.     IEVM's prior activities with the BP Pakistan assets[2] included:

- Drilling and production engineering during initial Badin discoveries and development.

- Badin operations management during expansion into gas production and outlying oil development.

---

[2]   The BP Pakistan assets at issue are located in the Badin concession, the Mirpur Khas Block, and the Khipro Blocks.

Certified Document Number: 72606317 - Page 8 of 41

- Development and implementation of the safety and environmental management system currently in use by BP.

- Development and implementation of a program to investigate and if necessary remediate any environmental concerns from historical Badin drilling activities.

- Recognition of the need for 3-D seismic data in Badin as early as 1994 and recommendation of the first 3-D in the area. The resulting regional Mega Survey roughly doubled reserves, daily production, and extended peak production plateau for years beyond the projected decline.

- Development and governmental approval and implementation of a Mirpur Khas/Khipro Integrated Drilling Management Project for 19 wells—the first ever in Pakistan.

- Instrumental in the discovery of 9 oil and gas fields in the Mirpur Khas / Khipro blocks.

- Planning and acquisition of 2D and 3D seismic programs over Mirpur Khas/Khipro, geological and geophysical mapping, and generation of the 19 well exploration program.

- Thorough evaluation of the BP Badin assets in 2002—which was used to raise $140 million in financing for the acquisition of GOP's interest in Badin.

- Throughout the involvement in Badin and Mirpur Khas/Khipro, represented Union Texas, Orient Petroleum, and BowEnergy Resources at Technical and Operational Committee Meetings held with partners and DGPC (Directorate General Petroleum Concessions).

26.     Indeed, IEVM's principals were responsible for the initial push for 3D seismic in the area, which ultimately doubled the reserves in the Badin field. IEVM principals were also directly responsible for the discovery of 9 oil and gas fields in the Mirpur Khas and Khipro blocks, which ultimately were a substantial part of the BP assets for sale.

27.      IEVM's extensive past experience with the very BP assets at issue made it uniquely qualified to provide consulting on the sale. IEVM knew the oil and gas operations at issue, the staff members and other employees involved, the partners, the Pakistan Government entities involved, and the petroleum system (the geoscience of the fields).

Certified Document Number: 72606317 - Page 9 of 41

## II.   **IEVM learned of the BP sale and hired Mueller to represent it in finding a new buyer.**

28.    In late April 2010, the Deepwater Horizon blowout occurred in the Gulf of Mexico.  It was clear that BP would have to sell numerous assets to pay for the oil spill, including likely the Pakistan ones.

29.    Shortly thereafter, in May 2010—even before BP announced its sale—IEVM approached BP about the Pakistan assets.  Mick Francisco and Graham Livesey of IEVM met with the President of BP Pakistan, Tariq Khamisani, and suggested a potential management buyout, with IEVM as the management consultants.  Khamisani declined, concerned over his job if the buyout did not go through.

30.    As IEVM had predicted, two months later, on July 20, 2010, BP announced the sale of its Pakistan subsidiaries that hold the Pakistan assets (the BP oil and gas assets).

31.    IEVM immediately put together a detailed package to find an investor or buyer for the BP assets, including a detailed analysis of the Pakistan assets and the expected financial upside.  IEVM had two potential plans.  One, IEVM would secure funding directly so that it could purchase the assets directly and manage them.  Two, alternatively, IEVM would find a buyer for the assets, who would pay IEVM a finder's fee on the deal, hire it to provide consulting on the deal, and hire it to manage the assets after the acquisition.

32.    On or about July 28, 2010, Dan Hughes of IEVM mentioned the BP Pakistan project to Sean Mueller, a Houston broker/investment banker whom Hughes knew from consulting work for another client.  Mueller immediately told Hughes that he would like to represent IEVM on the deal.

33.    On or about July 29, 2010, IEVM retained Mueller to represent it in connection with the sale of the BP Pakistan assets.  The arrangement made sense.  IEVM had the technical

Certified Document Number: 72606317 - Page 10 of 41

oil and gas expertise, and Mueller had the financial expertise.

34.    Under the IEVM/Mueller retention agreement:

a.    Mueller was retained to represent IEVM in securing financing for IEVM to buy the assets and, alternatively, in finding a buyer for the BP Pakistan assets.

b.    Mueller would act as IEVM's agent in negotiating, reducing to writing, and obtaining the signed documents setting forth IEVM's role in the deal and IEVM's compensation.   Mueller would also keep IEVM informed about these matters.   For example, if a buyer were found, Mueller would act as IEVM's agent to: (a) negotiate the compensation and other terms paid by the buyer to IEVM, including the finder's fee and consulting/management agreement; and (b) reduce to writing and finalize the agreement with the buyer. IEVM specifically discussed with Mueller at that time that its compensation would include a finder's fee and management/consultant fees by the buyer, and that IEVM wanted an equity interest in the deal plus certain cash payments.

c.    Mueller was IEVM's agent.  IEVM understood that the buyer would likely hire Mueller to provide financial consulting on the sale.  However, IEVM expected and relied upon Mueller to negotiate a compensation agreement with the buyer that fairly and accurately represented a division of the respective time, resources, and expertise provided by IEVM versus Mueller and any of his contacts.  IEVM brought unique expertise on the Pakistan assets and would be spending considerably more time and resources on the project than Mueller.

d.    In turn, Mueller would be paid a portion of the equity interest paid by the buyer.  His interest would either be paid directly by the buyer or the buyer would pay a larger percentage interest to IEVM, who would in turn share a portion of that with

Certified Document Number: 72606317 - Page 11 of 41

11

Mueller.

35.     On or about July 28, 2010, IEVM provided an overview of the project, including IEVM's confidential, proprietary, and trade secret evaluation of the expected purchase price, to Mueller.  Also, pursuant to this retention agreement, on or about July 30, 2010, Mueller sent an email to BP stating that he had been retained to represent IEVM regarding the Pakistan assets and that IEVM wanted to be included in the bidding list.  BP subsequently approved IEVM as a qualified bidder.

36.     In early August, on or about August 4, 2010, IEVM sent a detailed presentation on the Pakistan assets to Mueller.  This presentation included a history of the assets, IEVM's evaluation of the assets, a detailed proposal for the buyer's pre-acquisition evaluation, IEVM's proposal for post-acquisition development, and an analysis of the upside opportunities to the buyer.  The presentation also set forth IEVM's plans for exploiting the current production base, growing the reserve base in proven play trends, and testing new plays to access even more upside of the assets.  This presentation contained highly confidential, proprietary, trade secret analysis by IEVM.

37.     IEVM also prepared and sent to Mueller a Scoping Economics analysis of the Pakistan assets.  This document set forth IEVM's analysis of the current oil and gas production and the known reserves.  It included an anticipated bid price and a specific financial analysis for each property—the expected additional reserves, probability of success, and proposals for new exploration.  This analysis was likewise highly confidential, proprietary, and trade secret.

38.     IEVM's analysis set forth a specific, proprietary economic model of the assets, with detailed supporting calculations, of the expected production and cash flows for the assets for the next 10 years.  IEVM's proprietary analysis of the future expected future oil and gas

reserves that could be developed on the assets was particularly critical.  That was a significant part of the value of the assets—the discovery of additional oil and gas reserves—and IEVM believed these assets had a high upside potential.  Again, this analysis was likewise highly confidential, proprietary, and trade secret.

39.     All of this information IEVM provided to Mueller was inherently confidential, proprietary, and trade secret—a point that would have been particularly obvious to an investment banker like Mueller.  This information was used by IEVM; it gave IEVM a competitive, proprietary edge in obtaining a finder's fee and consulting agreement with a potential buyer, or in bidding on the BP assets for itself.  The information also had extraordinary actual and potential value because it was generally unknown and not readily ascertainable; it was IEVM's extensive, proprietary economic analysis of the assets, including expected future value.  Without this analysis, UEG would not have been able to make such a quick, preemptive bid for the BP assets, as discussed below.

40.     Further, IEVM maintained this information as confidential.  IEVM maintained this information as confidential on its secure computer system.  It did not disclose this information to third parties, except pursuant to the understanding that the information would be maintained as confidential.  Given the inherent trade secret nature of this information and his background expertise, Mueller knew or should have reasonably understood that he was required to maintain IEVM's information as confidential.  As IEVM's agent, Mueller also had a duty to maintain the confidentiality of this information.  And lest there be any doubt, IEVM specifically instructed Mueller not to disclose the information to UEG without obtaining a prior, written confidentiality agreement, as discussed below.

41.     Mueller put IEVM's presentation on his letterhead, along with IEVM's logo, to

Certified Document Number: 72606317 - Page 13 of 41

send to prospective investors and financers.  The presentation confirmed the parties' retention agreement.  It states that Mueller had been retained by IEVM regarding the BP Pakistan assets.  Again, this presentation contained highly confidential, proprietary, and trade secret information.

42.     In mid-August 2010, Mueller told IEVM that he had a possible buyer in China, through a Chinese contact.  On or about August 29, 2010, Mueller arranged for his Chinese contact, Ping Chen, to translate the IEVM presentation, including the Scoping Economics, into Chinese for this potential, unknown Chinese buyer.

43.     IEVM was extremely concerned about providing its proprietary, confidential, and trade secret information to an unknown, undisclosed entity in China without a written confidentiality agreement, a point IEVM discussed internally at the time.  IEVM specifically instructed Mueller to obtain a signed confidentiality agreement by the prospective Chinese buyer, before disclosing the BP sale and IEVM's highly confidential and proprietary analysis.  This instruction was made on the phone or about August 29, 2010 by Dan Hughes of IEVM to Mueller.

44.     Such a written confidentiality agreement is typical in this situation, with an unknown, undisclosed foreign company.  The confidentiality agreement would have, among other things: (a) prohibited the potential buyer from bidding on the Pakistan assets without compensating IEVM for introducing the buyer to the deal; and (b) prohibited the potential buyer from using IEVM's highly proprietary and confidential information without IEVM's consent and without compensating IEVM.

45.     Conversely, without a confidentiality agreement, the potential buyer could circumvent IEVM—the buyer could avoid paying IEVM a finder's fee on the deal and use all of IEVM's detailed, trade secret analysis without compensation.

46.     Unbeknownst to IEVM at that time, Mueller did not in fact obtain a signed confidentiality agreement before disclosing the BP sale and IEVM's confidential, trade secret analysis to UEG, a blatant breach of his retention agreement with IEVM and other duties.  Had IEVM known the truth—that Mueller had not obtained a signed confidentiality agreement from UEG—IEVM would never have consented to disclosing the BP sale and its analysis to UEG. But once Mueller had given the information away, that bell could not be un-rung.

### III.    UEG agrees to the finder's fee and consulting agreement with IEVM.

47.     On or about August 31, 2010, on behalf of IEVM and Mueller, Chinese intermediary Ping had dinner with the Chairman of China Orient/UEG, Hongwei Zhang, and presented the Pakistan deal to him.  China Orient is a corporate affiliate of UEG.  UEG was highly interested in the BP sale.

48.     On or about August 31, 2010 or within days thereafter, UEG agreed to pay IEVM a finder's fee and to hire it to provide consulting on the deal.  This agreement was negotiated on IEVM's behalf by Mueller and his Chinese contact Ping Chen.

49.     Under the IEVM/UEG finder's fee and consulting agreement:

a.      UEG agreed to hire IEVM to assist in the technical evaluation of the BP Pakistan assets.

b.      IEVM would receive a 2% equity interest in the deal.  IEVM's equity vested when certain events occurred, the last of which was payout—when UEG recouped its investment in the assets.

c.      After the BP deal closed, IEVM's members would enter into employment contracts with the UEG acquiring company or its affiliate, on an agreed level of compensation or otherwise on industry standard terms.

d.      UEG would reimburse IEVM for its out of pocket costs and expenses, including travel costs and expenses.

e.      Pursuant to the first provision of the IEVM/UEG agreement, UEG agreed to pay IEVM a retainer of $62,500, from January 1, 2011 through the closing of the deal. This agreement was made on or about January 10, 2011 and was confirmed by IEVM in writing on or about January 10, 2011.  The monthly cash payment represented only a small percentage of IEVM's consulting work on the deal, as IEVM was to be compensated primarily through the equity interest.  The cash payment was, among other things, negotiated to provide a minimum cash flow to IEVM during this time, as it was devoting substantially all of its time to UEG.

50.      UEG also agreed to hire Mueller to provide financial and structuring advice on the deal.  UEG agreed to pay Mueller and Ping a 2% equity interest in the deal, the same as IEVM—despite the fact that IEVM was the party that "found" the BP deal, had the unique expertise on it, and would be doing the overwhelming amount of work on it.

51.      A draft of the IEVM/UEG finder's fee/consulting agreement (also including the provision on Mueller and Ping) was prepared by Tom Moore, a Houston partner at the international law firm of Dewey & LeBoeuf.  Dewey & LeBoeuf represented, *inter alia*, UEG on the Pakistan deal.  A true and correct copy of this agreement is attached as Exhibit 2.

52.      UEG's lawyer at Dewey & LeBoeuf expounded on IEVM's equity interest in an email shortly thereafter.  On September 18, 2010, Partner Tom Moore emphasized that IEVM's equity interest was expected to be worth more than 2% of the purchase price.  Moore explained that:

> ***1.  At the closing of the acquisition, IEVM will get equity in the acquisition vehicle that will equate to 2% of the equity value of the company . . . .***

Certified Document Number: 72606317 - Page 16 of 41

* * *

*Assume that there is an IPO in a year that values the acquisition vehicle at $2 billion.  This would imply an equity valuation of $1.3 billion (after accounting for debt).  2% of that valuation would be $26 million.*

* * *

*It is important to recognize that the IEVM equity has a value even before the above thresholds are met since it is issued at the closing . . . .*

A true and correct copy of this September 18, 2010 email is attached as Exhibit 3.

53.     In turn, UEG received critical benefits under the IEVM finder's fee/consulting agreement.  IEVM brought to UEG all of the following benefits:

54.     The BP sale itself.  Although listed on the Hong Kong exchange, UEG was a domestic Chinese oil and gas company with little, if any, international projects.  UEG was not on the list of expected buyers for the Pakistan assets.  Without IEVM, it is highly unlikely that UEG would have learned about the deal at all.  And UEG certainly would not have learned about the BP deal in time to submit an early preemptive bid for the assets, as UEG did here, as discussed below.  And no other consulting firm would have had such an extensive trade secret analysis of the deal already prepared.

55.     The ability for UEG to make a preferential, preemptive bid.  UEG wanted to make a fast, preferential, preemptive bid to BP for the assets—a bid that BP would accept without waiting for other bids.  It is highly unlikely that BP would have accepted or even given credence to such a preferential, preemptive bid—to the exclusion of other bidders—without IEVM.  UEG also would not have been able to make such a fast, preemptive bid without all the background expertise that IEVM brought to the deal and IEVM's extensive trade secret evaluation and proposed plans for the assets.  No other consulting firm would have been so "up to speed" on the deal and its extensive benefits.  And no other consulting firm would have had such an extensive

17

trade secret analysis of the deal already prepared.

56.    <u>IEVM's extensive expertise on the Pakistan assets and its trade secret analysis.</u>
IEVM brought its extensive expertise on the Pakistan assets themselves.  As set forth in detail above, no other consulting firm had more experience in the Pakistan assets than IEVM.  And again, IEVM also brought its trade secret analysis.

57.    <u>Legitimacy and credibility to UEG.</u>   IEVM gave legitimacy and credibility to UEG's bid—a fact that UEG repeatedly emphasized in its dealings with BP, as set forth below. UEG was not an expected bidder.  It had little if any international projects, and no experience in Pakistan.  IEVM's involvement was needed for BP to take UEG's bid seriously—a fact UEG recognized, as it repeatedly touted to BP its "partnership" with IEVM as part of its qualifications to bid on the assets.  Further, UEG wanted to submit a preferential, preemptive bid for the assets to BP.

58.    <u>Key Contacts for the Deal.</u>   IEVM brought key contacts on the deal, including another key consultant for UEG.  From their previous extensive work on the assets, IEVM knew that oil and gas reserve analysts DeGolyer & McNaughton had previously analyzed the oil and gas reserve for these assets.  IEVM introduced UEG to DeGolyer & McNaughton and worked with the firm on the reserve analysis.  Again, this introduction, along with IEVM's expertise and trade secret analysis, allowed UEG to submit a fast, preemptive bid for the assets.

59.    <u>No risk to UEG.</u>   IEVM was being paid almost entirely on a contingent basis, only if it recouped its investment in the acquisition of the Pakistan assets.  The overriding majority of IEVM's compensation—the 2% equity—was on a contingency basis.   UEG otherwise only agreed to pay a relatively small monthly cash consulting payment and IEVM's out of pocket expenses through closing.  IEVM would not be paid the equity interest unless BP

accepted UEG's bid and the deal actually closed—something that was very far from certain at that time.   UEG was not on the expected list of bidders and had little if any international experience.   On top of that, IEVM's equity interest would not vest until payout—if and when UEG recouped its investment in the assets.   This was a very high risk for IEVM to take, but a very low risk on UEG's part.

60.     IEVM agreed to this finder's fee/consulting agreement with UEG.   However, IEVM was separately critical of the division of the equity interest among it, Mueller, and Ping. IEVM had "found" the deal, had the unique expertise on the assets, and would be spending significantly more time and resources on the Pakistan deal than Mueller and Ping.   Giving each a 2% interest did not accurately and fairly reflect each party's contribution and was contrary to IEVM's retention agreement with Mueller.   IEVM objected to this allocation with Mueller and Ping.

## IV.   Both IEVM and UEG begin performing under the finder's fee/consulting agreement, and UEG submits a preemptive bid for the assets.

61.     Less than a week later, on September 7, 2010, the Chairman of UEG sent a letter of introduction to BP to formally "present our credentials" to bid on the Pakistan assets.   This was necessary because UEG was not an expected bidder and had no international experience.

62.     UEG's September 7 letter further confirms that UEG had hired IEVM for the acquisition team.   As its qualifications, UEG emphasizes to BP the fact that it has "partnered" with IEVM on the deal.   UEG's Chairman wrote to BP:

> . . . The purpose of this letter is to formally introduce our interest and present our credentials.
>
> * * *
>
> In this effort to secure your Pakistan assets, China Orient Group/*United Energy Group has partnered with the former management of Union Texas and Orient*

Certified Document Number: 72606317 - Page 19 of 41

> ***Petroleum [IEVM].  We have the technical team in place that can understand your
> assets and in particular the value of your upside.***

Exh. 4 at 1 (emphasis added).

63.     On September 20, 2010, UEG followed with a more detailed letter to Malcolm

Coleman, the BP Head of Mergers and Acquisitions in charge of the Pakistan sale.  In response

to BP's questions on its qualifications, UEG again emphasized to BP the fact that it had hired

IEVM for the acquisition team—copying directly from IEVM's PowerPoint analysis:

> a)      [BP:] Your experience in oil and gas assets comparable with the size and
> scope of BP Pakistan.

> ***. . . The United Energy Group Limited's management team and technical team are
> primarily former PetroChina and Union Texas Pakistan senior management and
> technical personnel [IEVM].  The average work experience of our key management
> is more than 30 years.***

> b)      [BP:] Your operatorship experience, if any, within or outside Pakistan in
> assets of the size and scope of BP Pakistan.

> ***Three of our team members were senior executives with Union Texas Pakistan and
> Orient Petroleum [IEVM] who worked on the BP Pakistan assets through the
> entire cycle of bidding, drilling, exploration, and exploitation.***

> ***Our team members' [IEVM's] activities with the BP Pakistan oil and gas assets are
> as follows:***

> 1.  Drilling and production engineering during initial Badin discoveries and
> development.

> 2.  Badin operations management during expansion into gas production and outlying
> oil development.

> 3.  Development and implementation of the safety and environmental management
> system currently in use.

> 4.  Development and implementation of a program to investigate and if necessary
> remediate any environmental concerns from historical Badin drilling activities.

> 5.  Development, and governmental approval and implementation of a Mirpur
> Khas/Khipro Integrated Drilling Management Project for 19 wells—the first ever in
> Pakistan.

6.   Planning and acquisition of 2D and 3D seismic programs over Mirpur Khas/Khipro, geological and geophysical mapping and generation of the 19 well exploration program.

7.   Throughout the involvement in Badin and Mirpu Khas/Khipro, represented Union Texas, Orient Petroleum, and Bow Energy Resources at Technical and Operational Committee Meetings held with DGPC (Directorate General Petroleum Concessions).

* * *

f) Confirmation of any partnerships or consortia with other financial sponsors and/or industrial partners and/or other parties in relation to the Proposed Transaction. . . .

*. . . **Certain technical and operational personnel from PetroChina and Union Texas Petroleum [IEVM] have joined the United Energy Group Limited for further support.***

Exh. 5 at 1-3 (emphasis added).

64.   UEG's September 20 letter also confirmed that it had hired Dewey & LeBoeuf as its legal counsel and (at IEVM's recommendation) DeGolyer & McNaughton on the oil and gas reserves.  Exh. 5 at 4.  The letter also designated Sean Mueller and Ching Ping as its "principal point of contact" on the deal—not IEVM.  *Id.* at 5.

65.   At UEG's request, IEVM immediately began work on the deal.  During the Fall of 2010, IEVM's members spent substantially all of their time on the BP sale.   IEVM's work included:

- Extensive review and analysis of data through BP's virtual data room.

- Travel to Karachi on October 10-12, 2010 to review data at BP's data room there and meet with BP staff on the ongoing development and exploration plans.

- Attending meetings in London between BP and UEG on October 13, 2010.  UEG introduced IEVM to BP as its "partner" on the Pakistan deal.

- Attending meetings with the President of UEG, Xu Xiaolu and CFO of UEG, Thomas Pang, on or about October 13, to outline in detail the work UEG wanted IEVM to do during the next phases of the acquisition—including to evaluate the assets, educate the UEG personnel on the assets before closing, and help UEG manage the assets after closing.

- A second trip to London on October 25-26, 2010 to perform detailed analyses of the seismic data to confirm IEVM's projections.

- On or about November 1, 2011, at UEG's request, IEVM submitted a presentation outlining its experience in Pakistan and with the BP assets.   This information was included in UEG's formal offer to BP, as both BP and the Government of Pakistan required proof that UEG in fact had the technical capability to manage the assets.

- Extensive technical review of the information provided by BP, including supporting DeGolyer & McNaughton and other members of the UEG acquisition team to develop the UEG business model for the assets.

66.     On November 4, 2010, UEG's Board of Directors voted to approve submitting a pre-emptive bid of $775 million for the assets, to cut off competing bidders.  This would most likely not have been possible without IEVM's expertise and trade secret analysis.  On November 19, 2010, BP accepted UEG's offer, with certain conditions as is typical.

67.     IEVM played a key part in UEG's bid—indeed, without IEVM, UEG would not even have known of the sale and would not have been an approved bidder.  Recognizing these facts, Xu Xiaolu, the President of UEG sent an email to IEVM on or about November 21, 2010, congratulating IEVM on the deal.

68.     Also, pursuant to the finder's fee/consulting agreement, UEG paid IEVM's out of pocket expenses for this work.

69.     IEVM performed all of the above work on behalf of UEG, for UEG's benefit, and at its request.  UEG was fully aware that IEVM expected to be paid for this work, including the equity percentage.  And, UEG did in fact agree to pay IEVM for this work.  IEVM would not have performed any of this work had it known that UEG would not pay it, pursuant to the above agreement.  Instead, IEVM would have continued to work to find another buyer for the assets or to secure financing for IEVM to purchase the assets directly.

Certified Document Number: 72606317 - Page 22 of 41

## V.  IEVM continues to perform consulting work during the due diligence phase of the deal, pursuant to the IEVM/UEG agreement.

70.  Once UEG's bid was accepted by BP, the sale moved to the due diligence phase, from approximately December 2010 through September 2011.  During this entire time, UEG continued to request that IEVM perform extensive additional consulting work.  For example:

- On December 7, 2010, at very short notice, IEVM was asked to lead the site visit for UEG to review the BP properties in Pakistan, prior to UEG's public announcement of the purchase on December 14.  Two days later, from December 9-14, 2010, Mick Francisco travelled to Pakistan to show UEG personnel the site.

- On December 29, 2010, Rachel Zhang, the Executive Director of UEG and daughter of Chairman Hongwei Zhang, asked IEVM to attend a workshop in Beijing on the deal—again, at very short notice.  On or about January 6-9, 2011, IEVM flew to Beijing to meet with Chairman Zhang and other members of his staff and to attend the workshop.  The purpose of this workshop was to develop the forward strategy on the sale during the transition period when UEG began to assume control of the operations.

- When IEVM returned from Beijing, it began work on the required filings on the purchase for the Hong Kong stock exchange.  This included working with DeGolyer & McNaughton on the main engineering analysis to be included in the filings.  This was an ongoing project, with numerous revisions to the documents, before they were ultimately filed with the Hong Kong Stock Exchange.

- On January 20, 2011, IEVM travelled to Pakistan for further due diligence.  At that time, UEG's CFO Thomas Pang assured IEVM that the Chairman had approved the trip and would be paying for it.  During that trip, *UEG introduced IEVM to the Pakistan Minister of Petroleum as "members of UEG's team."  In fact, UEG gave IEVM's members business cards with UEG's logo and address, identifying them as UEG Senior Consultants.*  Attached as Exhibit 6 are true and correct copies of these UEG business cards.

- On or about January 26, 2011, at UEG's request, IEVM send their resumes to UEG, to be used in UEG's application to the Government of Pakistan for approval of the acquisition—as IEVM's expertise was plainly needed for the governmental approvals.

- From February 20-27, 2011, Dan Hughes of IEVM went to Karachi to work on petroscience software issues and ongoing evaluation of the productivity of the area.  This trip also included meetings with BP Pakistan to finalize a work program and budget for when UEG took control of the assets.  It included issues involving 3D seismic, drilling locations, contractual commitments, completion,

Certified Document Number: 72606317 - Page 23 of 41

production operations, and workover programs.  Meetings were also held with Pakistan government officials, which IEVM attended at UEG's request.

- IEVM performed other extensive analysis of the assets, including providing economic pro formas, geological information, providing fiscal information to the due diligent team, and supervising the engineering evaluation by DeGolyer & McNaughton.

71.     During this time, at UEG's request, IEVM devoted substantially all of its time to this project.  Much of the work was done in the late night Houston time, to accommodate UEG's business hours in Asia.  It was typical for IEVM to have several hour conference calls and multiple other calls in the middle of the night, followed by "day" work in Houston by IEVM.  UEG continued to refer to IEVM as its "partner" during this period.

72.     Pursuant to the IEVM/UEG agreement, IEVM invoiced UEG $62,500 monthly for each month from January 2011 through June 2011.  This retainer covered only a fraction of the true value of IEVM's services, as IEVM was to be compensated primarily through its equity interest.  However, UEG ultimately refused to pay any of the retainer.  In total, UEG owed IEVM $375,000 under this provision of the agreement.

73.     IEVM performed all of the above due diligence work at the request of UEG, pursuant to the parties' agreement.  IEVM expected to be paid for this work, UEG knew that IEVM expected to be paid, and UEG in fact had agreed to pay IEVM.   IEVM would not have performed any of this work had it known that UEG would not pay IEVM for this work pursuant to the parties' agreement.

74.     Additionally, throughout this phase, IEVM worked with Ping Chen and UEG in an attempt to obtain a signed version of the parties' agreement, as discussed in more detail below. This was required because Sean Mueller had effectively stopped representing IEVM on this matter, in violation of his duties to IEVM.

**VI.    UEG closes on the deal in September 2011 and refuses to pay IEVM.**

75.     UEG closed on the BP sale in Houston on or about September 15-16, 2011. IEVM was invited to the closing dinner celebration in Houston, along with Mueller and UEG executives.   During this dinner, UEG's CFO Thomas Pang toasted IEVM for providing "invaluable advice and service" to UEG and the acquisition team.  CFO Pang followed up with an email to IEVM, thanking them for all their work on the deal.

76.     However, UEG still refused to pay IEVM.   UEG refused to pay the monthly retainer, refused to pay or assign to IEVM its equity interest, and refused to hire IEVM to manage the Pakistan assets post sale.  The only payments that UEG made were for IEVM's out of pocket expenses—when IEVM had devoted almost all of its time and expertise to UEG for an entire year.  UEG continues to owe IEVM the 2% equity interest (worth at least $15.5 million), $375,000 in monthly retainer fees, and approximately $750,000 to $1 million for the post-sale management agreements.

**VII.   Mueller likewise breached his retention agreement and other duties to IEVM.**

77.     UEG was not the only party that breached its agreement with IEVM.   Mueller breached his retention agreement as well and otherwise violated his duties to IEVM.

78.     As set forth above, IEVM retained Mueller as its agent to negotiate, reduce to writing, and finalize its finder's fee/consulting agreement with UEG.

79.     The initial draft of the finder's fee/consulting agreement was prepared by Dewey & LeBoeuf around September 15, 2010 (Exh. 2).  Mueller visited UEG in Beijing on or about September 19, 2010 for meetings to finalize the agreement.  Beginning at that point, Mueller breached his retention agreement with IEVM.

Certified Document Number: 72606317 - Page 25 of 41

80.     Under the parties' retention agreement, Mueller had a duty to:

•       Obtain a signed, confidentiality agreement from UEG before disclosing  IEVM's confidential, proprietary, and trade secret information, and otherwise maintain the confidentiality of IEVM's information regarding the BP Pakistan sale.

•       Promptly negotiate the finder's fee/consulting agreement to resolution or impasse with UEG.

•       Prepare and exchange drafts of that agreement with UEG, reflecting the parties' negotiations and the terms proposed by each side.

•       Accept a reasonable deal from UEG on behalf of IEVM—particularly when what was being negotiated were relatively minor details on the mechanics of IEVM's equity interest.  The essential terms had already been set.

•       Keep IEVM promptly and reasonably informed about the status of the negotiations—including providing details on the disputed terms in the negotiations.

•       Faithfully represent IEVM's interests as its agent and fully disclose Mueller's dealings with UEG.

81.     Mueller did none of the above.  Had he done so, IEVM either would have had a full agreement with UEG, reduced to writing.  Or, IEVM would have known at that time that UEG would not agree to Mueller's terms.  At that point, IEVM would have been able to cut its losses and stop its work for UEG.

82.     Further, after the Beijing meeting, Mueller took little or no action action to following up on the negotiations with UEG and otherwise had limited communications with IEVM.  This was plainly a breach of the retention agreement and Mueller's duties as an agent, as Mueller was not promptly following up on the negotiations and keeping IEVM informed about their status.  In retrospect, it appears that Mueller began withdrawing from IEVM in October 2011.  At that time, on or about October 13, 2010, Ping and Mueller told IEVM that they intended to set up offshore companies for their compensation from UEG and suggested that

IEVM do the same.  In response, IEVM told Ping and Mueller that it intended to declare the income from the UEG deal to U.S. tax authorities.

83.     Mueller's involvement in the IEVM finder's fee/consulting agreement apparently completely stopped after BP accepted UEG's bid in late 2010 and the deal moved to the due diligence phase.  Mueller stopped sending IEVM emails on the deal after  around December 14, 2010.  By January 2011 (if not sooner), IEVM was left to deal with Ping and UEG directly.  To IEVM's knowledge, Mueller stopped negotiations on the IEVM/UEG agreement—and if there were any communications, Mueller did not inform IEVM about them.

84.     Mueller's breach forced IEVM to spend considerable time on this issue, when it was already devoting extraordinary amounts of time providing consulting work to UEG.  Among other things, IEVM had extensive communications with Ping Chen and UEG about the deal, including, by way of example, on or about the following dates: Jan. 10-11, 13, 14, 16-17, 18, 21, 25, and 27, 2011; Feb. 20 and 26, 2011; March 3, 8, 15, and 25, 2011; and May 1, 4, 9, 10, and 16, 2011.  On top of that, IEVM internally spent considerable amount of time on the issue.  This was work that Mueller had been retained to do.

85.     IEVM spent a significant amount of time on its direct dealings with Ping and UEG.   IEVM estimates that from January 2011 through September 2011 alone, it spent approximately 120 hours, at an estimated cost of $27,000 in professional time, on the finder's fee/consulting agreement—work that it had hired Mueller to do.

86.     Moreover, after the BP/UEG deal closed in September 2011, Mueller cut all communications with IEVM.   IEVM repeatedly attempted to contact Mueller in the Fall of 2011.  Mueller refused to return IEVM's phone calls or emails.

Certified Document Number: 72606317 - Page 27 of 41

87.     At that point, IEVM was forced to hire counsel, Gerry Swonke, to attempt to obtain a resolution from UEG.  Mueller refused to respond to Swonke's email or call around December 15, 2011.

88.     Mueller likewise refused to assist IEVM in collecting the amounts owed and refused to otherwise join in its legal proceedings against UEG.  Mueller was owed, individually, at least $15.5 million.  It is not credible that Mueller would simply "walk away" from UEG's breach without even considering his options for collection.

89.     Finally, upon information and belief, Mueller may have received compensation, directly or indirectly, from UEG for the BP deal—the real reason he refused to assist IEVM after the deal closed.  Mueller proceeded to work with UEG on other deals, including the potential acquisition of assets from LLOG Exploration in the Gulf of Mexico in the Fall of 2011—at the very same time he was refusing to return IEVM's calls and emails.  Indeed, in light of all of Mueller's conduct, IEVM believes that Mueller "switched sides," to the detriment of IEVM.

## VIII. IEVM and UEG enter into the Supplemental Agreement containing the arbitration clause at issue.

90.     In March 2012, UEG approached IEVM to provide additional consulting work on the BP assets.  IEVM ultimately agreed to do so, subject to certain conditions, including that: (a) UEG acknowledge in writing that it owed IEVM for the past finder's fee and consulting work; and (b) UEG agreed to arbitrate its dispute with IEVM over the finder's fee and consulting agreement and the additional work.

91.     UEG and IEVM entered into a Supplemental Agreement on or about March 12, 2012, attached as Exhibit 1.  It is signed by Rachael Zhang, the Executive Director of UEG and the daughter of the Chairman.

Certified Document Number: 72606317 - Page 28 of 41

92.    This agreement contains several critical terms.   First, the 2012 agreement expressly provides that it supplements the parties' earlier finder's fee/consulting agreement.  The Supplement provides:

> 13. **Entire Agreement**.  This Agreement contains the entire agreement of the parties with respect to the subject matter herein, and supersedes all prior negotiations, agreements and understandings with respect thereto; provided, however, that *this Agreement does not supersede, but is a supplement to, the agreement with respect to the prior work completed by the Released Parties [IEVM and its principals] for UEG.* (emphasis added)

93.    Second, UEG expressly acknowledged in the Supplemental Agreement that it owed IEVM for the previous finder's fee and consulting work.  The Supplement provided:

> WHEREAS, UEG has acquired oil and gas properties from BP Pakistan (Badin), Inc., and other BP subsidiaries with oil and gas properties in Pakistan ("BP"); and

> *WHEREAS, the Released Parties [IEVM and its principals] introduced UEG to BP and acted as facilitator and were retained by UEG as consultant to assist in the purchase in such properties by UEG; and*

> WHEREAS, during such time when the Released Parties acted as consultant to UEG the Released Parties *[IEVM and its principals] were not paid for such services rendered but were to be paid following the closing of the purchase of such properties from BP....*

> * * *

> 5.    *Past Services.  UEG acknowledges that the Released Parties [IEVM and its principals] did provide valuable services with respect to the subject purchase and sale by and between UEG and BP.  UEG further acknowledges that payment for such services has not been paid by UEG.*  Further, UEG represents to the Released Parties that the work associated with the additional services requested of the Released Parties by UEG does not alter nor replace the amount due the Released Parties from the prior work done.  (emphasis added).

94.    Third, UEG agreed to a Texas choice of law clause and to arbitrate the parties' dispute in Houston, Texas.  The Supplement provides:

> **6. Governing Law, Arbitration.**   This Agreement shall be governed by and interpreted by the laws of the state of Texas.   Any controversies arising out of this Agreement or its interpretation shall be settled by a single arbitrator in Houston, Texas in accordance with the rules of the American Arbitration Association, and the

judgment upon award may be entered in any court having jurisdiction thereof.

95.     Despite these terms, UEG continued to refuse to pay IEVM the amounts owed under the finder's fee/consulting agreement.

## IX.    IEVM was thus forced to file suit and arbitration against UEG and Mueller in 2013.

96.     On or about July 30, 2013, IEVM filed suit against UEG and Mueller styled, *International Energy Ventures Management LLC v. United Energy Group, LTD and Sean Mueller*; Cause No. 2013-44404; In the 270th Judicial District Court of Harris County, Texas. Defendants removed the case to federal court, styled *International Energy Ventures Management LLC v. United Energy Group, LTD and Sean Mueller*; Cause No. 4:13-cv-02754; In the United States District Court for the Southern District of Texas.

97.     Shortly thereafter, on or about November 8, 2013, IEVM moved to compel arbitration against UEG.  UEG opposed arbitration.  ECF 31–32.[3]  The federal district court, Judge Kenneth Hoyt, ultimately stayed the briefing and the ruling on the motion to compel arbitration until after the Court ruled on UEG's motion to dismiss for insufficient service and for lack of personal jurisdiction.

98.     On July 25, 2014, Judge Hoyt dismissed all IEVM's claims against Mueller and UEG.

99.     IEVM appealed.  In this appeal, UEG argued that the finder's fee/consulting agreement was not subject to arbitration.[4]

100.    The Fifth Circuit ultimately held that:

        a.     IEVM's claims against Mueller shall be dismissed without prejudice, and

---

[3]    The Court may take judicial notice of the existence of the federal court filings in the previous case.

[4]    Fifth Circuit Cause No. 14-20552, Brief of Appellees at 41–45.

Certified Document Number: 72606317 - Page 30 of 41

that IEVM could refile suit against Mueller in state court.  The Court stated:  "As the claim or claims against the nondiverse defendant [Mueller] must be dismissed *without prejudice*, the plaintiff is not barred by res judicata from refiling those claims in state court if he so desires."  *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 202, n. 25 (5th Cir. 2016) (emphasis in original).

      b.     UEG consented to personal jurisdiction in Texas for purposes of an action to compel arbitration:  "When a party agrees to arbitrate in a particular state, via explicit or implicit consent, the district courts of the agreed-upon state may exercise personal jurisdiction over the parties for the limited purpose of compelling arbitration."  *Int'l Energy Ventures Mgmt., L.L.C. v. United Energy Grp., Ltd.*, 818 F.3d 193, 212 (5th Cir. 2016) (citations and quotations omitted).

      c.     No specific personal jurisdiction existed over UEG for the lawsuit claims generally, as the Court determined that UEG did not have the requisite minimum contacts with Texas.

      d.     The Fifth Circuit remanded accordingly.

101.    On September 6, 2016, the federal district court dismissed IEVM's claims against UEG and Mueller without prejudice, for lack of jurisdiction.  The district court did not rule on IEVM's motion to compel arbitration—and indeed, the motion was never even fully briefed.

102.    As above, the Fifth Circuit held that personal jurisdiction exists over UEG for the purpose of compelling arbitration.  As the district court dismissed the case without ruling on the issue, IEVM is filing this suit to compel arbitration against UEG.  IEVM is also filing suit for damages and other relief against Mueller, pursuant to the Fifth Circuit opinion.

Certified Document Number: 72606317 - Page 31 of 41

103.    Additionally, within months after filing the initial state court suit in 2013, IEVM instituted arbitration against UEG with the American Arbitration Association.  The arbitrator wrongfully dismissed IEVM's claims without prejudice, holding that IEVM had waived arbitration by filing suit.  The arbitrator's holding was flatly contrary to the Texas Supreme Court's rulings on this precise issue.  *E.g.*, *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 455 S.W.3d 573, 576 (Tex. 2014) (collecting cases).

104.    Additionally, the arbitrator's ruling was outside the scope of his authority.  Texas law is clear that the courts, not the arbitrator, decide whether a party has (allegedly) waived arbitration by filing suit.  *See id.*

105.    Both of these points would have been briefed and addressed by the federal district court as part of the motion to compel arbitration.  But, as explained above, the federal district court stayed the briefing and the ruling on compelling arbitration, and then dismissed the case without prejudice—never ruling on IEVM's motion to compel arbitration.  Moreover, IEVM's lawsuit was dismissed for lack of jurisdiction—meaning that IEVM had arguably not even filed its litigation claims against UEG in a court of competent jurisdiction.

## X.    Procedural Matters Regarding Arbitration

106.    <u>Jurisdiction.</u>  As set forth above, this Court has jurisdiction over this Application to Compel Arbitration.  A valid and enforceable agreement to arbitrate exists, pursuant to Tex. Civ. Prac. & Rem. Code § 171.001.  *See also* Exh. 1 & 8, ¶ 4.  That arbitration agreement provides for arbitration in the State of Texas, under Texas law:

> **6. Governing Law, Arbitration.**   This Agreement shall be governed by and interpreted by the laws of the state of Texas.  Any controversies arising out of this Agreement or its interpretation shall be settled by a single arbitrator in Houston, Texas in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.  Exh. 1 at 6.

Certified Document Number: 72606317 - Page 32 of 41

107.    This Court also has personal jurisdiction over UEG for the purpose of compelling arbitration pursuant to the Supplemental Agreement.  UEG consented to arbitration in Houston, Texas, thereby consenting to this Court's personal jurisdiction for the purposes of compelling arbitration.

108.    <u>Arbitration Agreement:</u>  Attached as Exhibit 1 is a true and correct copy of the agreement to arbitrate.

109.    <u>Definition of the issue subject to arbitration between the parties under the agreement:</u>  Any controversy arising out of IEVM's agreement with and services to UEG with respect to the purchase and sale by and between UEG and BP of oil and gas assets in Pakistan, including any controversy arising out of the parties' finder's fee/consulting agreement discussed above and the Supplemental Agreement thereto, and their interpretation.

110.    <u>The status of arbitration before the arbitrators:</u>  IEVM is separately filing a demand for arbitration with the American Arbitration Association.  However, defendant UEG has consistently denied that an agreement to arbitrate exists, requiring IEVM to file this Application to Compel Arbitration.

111.    <u>The need for the Court order sought by IEVM:</u>  This point cannot seriously be disputed.  UEG has consistently refused to arbitrate its claims with IEVM, apparently contending (incorrectly), among other things, that the arbitration provision in the Supplemental Agreement does not apply to the parties' finder's fee/consulting agreement.  *See* ¶ 97-99 above.  This Application to Compel Arbitration is thus necessary.  If UEG agrees to arbitrate this dispute, IEVM will withdraw this Application.

Certified Document Number: 72606317 - Page 33 of 41

## Causes of Action

### I.    Cause of Action 1:  Application to Compel Arbitration Against UEG

112.    IEVM incorporates by reference all of the allegations set forth above as though fully set forth herein.

113.    A valid agreement to arbitrate exists between IEVM and UEG that governs this dispute, attached as Exhibit 1.  That agreement is to arbitrate a controversy that existed at the time of the arbitration agreement, as set forth expressly in the agreement to arbitrate.    Exh. 1, Recitals at § 5 (Past Services); *see also* Exh. 7, ¶ 4.

114.    IEVM seeks to arbitrate a dispute that is within the scope of the arbitration agreement.  Pursuant to the Supplemental Agreement, the parties agreed to supplement the finder's fee/consulting agreement to add, among other terms, an arbitration provision.  Thus, pursuant to the Supplemental Agreement, the parties agreed to arbitrate any controversies arising out the finder's fee/consulting agreement and its interpretation.  That is precisely what IEVM dispute with UEG is over, as set forth in detail above.

115.    UEG has refused to arbitrate its controversy with IEVM.

116.    The Court should grant this application and compel UEG to arbitrate pursuant to TEX. CIV. PRAC. & REM. CODE Chapter 171, or alternatively pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*.    This Court should order UEG to arbitrate the parties' controversy arising out of IEVM's agreement with and services to UEG with respect to the purchase and sale by and between UEG and BP of oil and gas assets in Pakistan, including any controversy arising out of the parties' finder's fee/consulting agreement discussed above and the Supplemental Agreement thereto, and their interpretation.

## II.    Cause of Action 2:  Breach of the Retention Agreement by Mueller

117.    IEVM incorporates by reference all of the allegations set forth above as though fully set forth herein.

118.    Mueller breached his contract with IEVM.  IEVM and Mueller entered into the retention agreement set forth above.

119.    Mueller breached this agreement in numerous ways, including by:

•    Failing to obtain a signed confidentiality agreement before disclosing the BP sale and IEVM's trade secret analysis to UEG.

•    Failing to keep IEVM informed about the status of negotiations with UEG in the Fall of 2010;

•    Failing to promptly negotiate the finder's fee/consulting agreement, either until a written agreement was obtained or the parties reached impasse.

•    Failing to follow up on the negotiations with UEG after the September 19, 2010 meeting.

•    Failing to represent IEVM in its dealings with UEG after approximately December 2010.

•    Refusing any communications with IEVM after the BP deal closed.

•    Refusing to assist IEVM in collecting from UEG after the BP deal closed.

•    Failing to faithfully represent IEVM and otherwise breaching his duties as an agent.  Among other things, Mueller may have switched sides and represented UEG, to IEVM's detriment, and Mueller may have received compensation directly or indirectly from UEG.

120.    IEVM has been directly harmed as a result of these breaches of the retention agreement, and sues Mueller for damages accordingly.

## III.    Cause of Action 3:  Breach of Fiduciary Duty (against Mueller)

121.    IEVM incorporates by reference all of the allegations set forth above as though fully set forth herein.

122.    Mueller agreed to represent IEVM as its agent.  Mueller thus owed fiduciary duties to IEVM.

123.    Mueller breached his fiduciary duties to IEVM in numerous ways, including but not limited to:

- Failing to obtain a signed confidentiality agreement before disclosing the BP sale and IEVM's highly confidential, proprietary, and trade secret analysis to UEG.

- Failing to keep IEVM informed about the status of negotiations with UEG in the Fall of 2010;

- Failing to promptly negotiate the finder's fee/consulting agreement, either until a written agreement was obtained or the parties reached impasse.

- Failing to follow up on the negotiations with UEG after the September 19, 2010 meeting.

- Failing to represent IEVM in its dealings with UEG after approximately December 2010.

- Refusing any communications with IEVM after the BP deal closed.

- Refusing to assist IEVM in collecting from UEG after the BP deal closed.

- Negotiating an equity arrangement with UEG for his advantage, and to IEVM's detriment, as that agreement did not fairly and accurately reflect each parties' respective contribution to the deal and related matters concerning payment from UEG.

- Failing to faithfully represent IEVM as its agent and, upon information and belief, failing to fully disclose his dealings with UEG.  Among other things, Mueller may have switched sides and represented UEG, to IEVM's detriment, and Mueller may have received compensation directly or indirectly from UEG.

124.    The above actions constitute breach of Mueller's duties of, *inter alia*, loyalty and good faith, candor, to refrain from self-dealing, to act with integrity of the strictest kind, of fair, honest dealing, and of full disclosure.  IEVM has been directly harmed as a result of Mueller's breaches of his fiduciary duties to IEVM, and sues for all damages for those breaches.  Among other damages, IEVM is entitled to disgorgement of monies and other benefits Mueller received

Certified Document Number: 72606317 - Page 36 of 41

in breach of his fiduciary duties.

## IV.   Cause of Action 4:        Misappropriation of Trade Secrets (pleaded in the alternative as to Mueller)

125.    IEVM incorporates by reference all of the allegations set forth above as though fully set forth herein.

126.    Plaintiff IEVM owned a trade secret: its extensive, proprietary and confidential analysis of the BP Pakistan assets and related matters on the BP sale, as detailed above (including in paragraphs 35–40), which are incorporated by reference.  IEVM prepared and used its analysis in its business, and by definition, had the right to use its own information.  This information had actual and potential independent economic value, and the information gave IEVM a competitive advantage over those who did not know it.   Indeed, IEVM's extensive analysis was one of the main reasons UEG hired it, and IEVM's analysis allowed UEG to make a fast, preemptive bid to BP for the assets.

127.    IEVM's information was generally unknown and unavailable to third parties, who could obtain value from its disclosure or use—as in fact UEG did.   It was IEVM's proprietary model for the BP assets, including IEVM's economic analysis, specific recommended future development plans, and analysis of the upside opportunities.  Plaintiff IEVM took reasonable efforts to maintain this information as confidential, including maintaining the information as secure on its computer system, only disclosing the information to third parties with the understanding that it would be maintained as confidential, and specifically instructing Mueller to obtain a signed confidentiality agreement before disclosing this information to UEG.  Further, this information could not be readily ascertained by proper means.  Again, it was IEVM's proprietary economic model for the assets, including IEVM's recommended future development and upside opportunities.

Certified Document Number: 72606317 - Page 37 of 41

128.    As detailed above, IEVM specifically instructed Mueller to obtain a signed confidentiality agreement before providing IEVM's trade secret analysis to UEG.

129.    IEVM believes that UEG agreed to compensate it, pursuant to the finder's fee/consulting agreement detailed above, for IEVM's trade secret information.  However, to the extent that UEG did not agree to compensate IEVM for its trade secret information, Mueller misappropriated IEVM's trade secret.  Mueller acquired IEVM's trade secret information under circumstances giving rise to a duty that he maintain its secrecy and limit its use.  Mueller was IEVM's agent and the information was obviously confidential—something an investment banker would be well aware of.  Additionally, IEVM specifically instructed Mueller not to disclose the information to UEG without first obtaining a signed confidentiality agreement.   Mueller disclosed it to UEG without IEVM's consent, in violation of IEVM's express instructions.  Mueller's unauthorized disclosure to UEG was also in breach of the confidential, contractual, and fiduciary relationship he had with IEVM.

130.    IEVM was damaged as a result of Mueller's wrongful disclosure.  Among other things, UEG was able to misappropriate IEVM's trade secret analysis and make a fast, preferential bid on the assets, without paying IEVM.

131.    Mueller's actions constitute misappropriation of trade secrets, under Texas common law and/or TEX. CIV. PRAC. & REM. CODE Chapter 134A.

**V.    Cause of Action 5:   Attorneys' Fees, Expenses, and Costs of Court (against Mueller)**

132.    IEVM incorporates by reference all of the allegations set forth above as though fully set forth herein.

133.    As to Mueller, IEVM seeks to recover its reasonable attorneys' fees, all expenses of litigation (including expert expenses), and costs of court, including but not limited to attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE Chapter 38.

134.    IEVM is entitled to recover judgment against Mueller for those attorneys' fees, including fees for:  preparation and trial of this lawsuit; post-trial and pre-appeal legal services; any appeals; and post-judgment discovery and collection in the event execution on the judgment is necessary.

**Damages and Other Relief Requested**

135.    IEVM respectfully request that the Court grant this Application to Compel Arbitration and order UEG to arbitration.

136.    As to Mueller, IEVM sues for all damages and other relief, including without limitation:

- All general damages (including general/direct and special/consequential damages);

- All exemplary/punitive damages;

- Disgorgement of monies and other benefits received in violation of his fiduciary duties to IEVM;

- Reliance and quantum meruit damages;

- All equitable relief, including unjust enrichment and equitable monetary recoveries under any and all equitable causes of action above;

- Pre-judgment and post-judgment interest;

- Costs of court; and

- Attorneys' fees, expert fees, and all other costs and expenses of litigation.

Certified Document Number: 72606317 - Page 39 of 41

137.   IEVM affirmatively pleads that it seeks monetary relief aggregating more than the statutory minimum for this Court.

138.   IEVM seeks and respectfully requests that the Court grant it all other damages and relief, at law and in equity, to which IEVM is entitled.

### Conditions Precedent and Notice

139.   All conditions precedent and all notices (assuming *arguendo* any conditions precedent and notice requirements exist) have occurred, have been performed, have been satisfied, and/or have been waived, excused, or would be futile.

### Tolling of Limitations

140.   Any applicable statute of limitations for IEVM's claims has not run.  Assuming arguendo any limitations issue exists, any applicable statute of limitations period has been tolled by, *inter alia*, the Texas Savings Statute, TEX. CIV. PRAC. & REM. CODE §16.064 and under the Court's equitable tolling powers.

### Demand for Jury Trial

141.   IEVM respectfully submits that the Court should compel arbitration of its dispute with UEG.

142.   IEVM hereby demands a jury trial on all issues triable by jury in this case, as to the dispute between IEVM and Mueller, including on, all defenses/affirmative defenses asserted by both sides, and all issues in all answers.  This jury demand also applies and extends to all issues raised in all supplemental, amended, and subsequent pleadings filed in this case.

143.   To the extent applicable, if any, IEVM hereby demands a jury issue on any fact issue or alleged fact issue to be decided regarding compelling arbitration against UEG pursuant to this Application.

Certified Document Number: 72606317 - Page 40 of 41

**General and Special Prayers for Relief**

WHEREFORE, IEVM sues and prays for all relief damages and all other relief, at law and in equity, to which it is entitled, including but not limited to:

a.      An order compelling UEG to arbitrate its dispute with IEVM.

b.      As to Mueller: general/direct damages, special/consequential damages, exemplary/punitive damages, all reliance and quantum meruit damages, all equitable relief (including but not limited to unjust enrichment, disgorgement, and equitable monetary recoveries), pre-judgment and post-judgment interest, costs of court, specific performance, attorneys' fees, expert fees, and all other costs and expenses of litigation.

c.      All other relief, at law and in equity, to which IEVM is entitled.

Respectfully submitted,

*/s/ Michael D. Sydow*
Michael Sydow
State Bar No.  19592000
THE SYDOW LAW FIRM
5020 Montrose Boulevard, Suite 450
Houston, Texas 77006
Telephone:  (713) 622-9700
Facsimile:  (713) 552-1949
michael.sydow@thesydowfirm.com

*/s/ Thomas C. Wright*
Thomas C. Wright
State Bar No. 22059400
Kathleen S. Rose
State Bar No. 00798473
WRIGHT & CLOSE, LLP
One Riverway, Suite 2200
Houston, Texas 77056
Telephone:  (713) 572-4321
Facsimile:  (713) 572-4320
wright@wrightclose.com
rose@wrightclose.com

***Attorneys for IEVM***

41



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606317 Total Pages:  41

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

11/4/2016 1:29:17 PM
Chris Daniel District Clerk
Harris County
Envelope No: 13629697
By: EVANS, BONISHA E
Filed: 11/4/2016 1:29:17 PM

## CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY):* **2016-76737 / Court: 157**   COURT *(FOR CLERK USE ONLY):* _____

### STYLED INTERNATIONAL

(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

| 1. Contact information for person completing case information sheet: | | Names of parties in case: | Person or entity completing sheet is: |
|---|---|---|---|
| Name:<br>Michael D. Sydow<br><br>Address:<br>5020 Montrose Boulevard, Suite 450<br><br>City/State/Zip:<br>Houston, Texas 77006<br><br>Signature:   /s/ Michael D. Sydow | Email:<br>michael.sydow@thesydowfirm.com<br><br>Telephone:<br>(713) 622-9700<br><br>Fax:<br>(713) 552-1949<br><br>State Bar No:<br>19592000 | Plaintiff(s)/Petitioner(s):<br><br>International Energy Ventures Management, LLC<br>_____<br><br>Defendant(s)/Respondent(s):<br><br>United Energy Group Limited<br>Sean Mueller<br>_____<br><br>[Attach additional page as necessary to list all parties] | ☒Attorney for Plaintiff/Petitioner<br>☐*Pro Se* Plaintiff/Petitioner<br>☐Title IV-D Agency<br>☐Other:<br><br>Additional Parties in Child Support Case:<br><br>Custodial Parent:<br><br>Non-Custodial Parent:<br><br>Presumed Father:<br>_____ |

**2. Indicate case type, or identify the most important issue in the case *(select only 1):***

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions<br>(non-Title IV-D)** |
| *Debt/Contract*<br>☐Consumer/DTPA<br>☐Debt/Contract<br>☐Fraud/Misrepresentation<br>☐Other Debt/Contract:<br><br>*Foreclosure*<br>☐Home Equity—Expedited<br>☐Other Foreclosure<br>☐Franchise<br>☐Insurance<br>☐Landlord/Tenant<br>☐Non-Competition<br>☐Partnership<br>☐Other Contract:<br>_____ | ☐Assault/Battery<br>☐Construction<br>☐Defamation<br>*Malpractice*<br>☐Accounting<br>☐Legal<br>☐Medical<br>☐Other Professional<br> Liability:<br>☐Motor Vehicle Accident<br>☐Premises<br>*Product Liability*<br>☐Asbestos/Silica<br>☐Other Product Liability<br> List Product:<br>_____<br>☐Other Injury or Damage:<br>_____ | ☐Eminent Domain/<br> Condemnation<br>☐Partition<br>☐Quiet Title<br>☐Trespass to Try Title<br>☐Other Property:<br>_____ | ☐Annulment<br>☐Declare Marriage Void<br>*Divorce*<br>☐With Children<br>☐No Children | ☐Enforcement<br>☐Modification—Custody<br>☐Modification—Other |
| | | | | **Title IV-D** |
| | | | | ☐Enforcement/Modification<br>☐Paternity<br>☐Reciprocals (UIFSA)<br>☐Support Order |
| | | **Related to Criminal Matters** | **Other Family Law** | **Parent-Child Relationship** |
| | | ☐Expunction<br>☐Judgment Nisi<br>☐Non-Disclosure<br>☐Seizure/Forfeiture<br>☐Writ of Habeas Corpus—<br> Pre-indictment<br>☐Other: _____ | ☐Enforce Foreign<br> Judgment<br>☐Habeas Corpus<br>☐Name Change<br>☐Protective Order<br>☐Removal of Disabilities<br> of Minority<br>☐Other: _____ | ☐Adoption/Adoption with<br> Termination<br>☐Child Protection<br>☐Child Support<br>☐Custody or Visitation<br>☐Gestational Parenting<br>☐Grandparent Access<br>☐Paternity/Parentage<br>☐Termination of Parental<br> Rights<br>☐Other Parent-Child:<br>_____ |
| **Employment** | **Other Civil** | | | |
| ☐Discrimination<br>☐Retaliation<br>☐Termination<br>☐Workers' Compensation<br>☐Other Employment: | ☐Administrative Appeal<br>☐Antitrust/Unfair<br> Competition<br>☐Code Violations<br>☐Foreign Judgment<br>☐Intellectual Property | ☐Lawyer Discipline<br>☐Perpetuate Testimony<br>☐Securities/Stock<br>☐Tortious Interference<br>☒Other: Compel<br>Arbitration | | |
| **Tax** | *Probate & Mental Health* | | | |
| ☐Tax Appraisal<br>☐Tax Delinquency<br>☐Other Tax | *Probate/Wills/Intestate Administration*<br>☐Dependent Administration<br>☐Independent Administration<br>☐Other Estate Proceedings | ☐Guardianship—Adult<br>☐Guardianship—Minor<br>☐Mental Health<br>☐Other: _____ | | |

**3. Indicate procedure or remedy, if applicable *(may select more than 1):***

| | | |
|---|---|---|
| ☐Appeal from Municipal or Justice Court<br>☒Arbitration-related<br>☐Attachment<br>☐Bill of Review<br>☐Certiorari<br>☐Class Action | ☐Declaratory Judgment<br>☐Garnishment<br>☐Interpleader<br>☐License<br>☐Mandamus<br>☐Post-judgment | ☐Prejudgment Remedy<br>☐Protective Order<br>☐Receiver<br>☐Sequestration<br>☐Temporary Restraining Order/Injunction<br>☐Turnover |

**4. Indicate damages sought *(do not select if it is a family law case):***

☐Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees<br>
☐Less than $100,000 and non-monetary relief<br>
☐Over $100, 000 but not more than $200,000<br>
☐Over $200,000 but not more than $1,000,000<br>
☐Over $1,000,000

Certified Document Number: 72606325 - Page 1 of 1

Rev 2/13



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:          72606325 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

Case 4:17-cv-02262   Document 1-1   Filed on 07/24/17 in TXSD   Page 46 of 86

11/4/2016 1:29:17 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 13629697
By: EVANS, BONISHA E
Filed: 11/4/2016 1:29:17 PM

## CIVIL PROCESS REQUEST FORM

2016-76737 / Court: 157

| FOR EACH PARTY SERVED YOU MUST FURNISH ONE (1) COPY OF THE PLEADING PER PARTY. |
| FOR WRITS FURNISH TWO (2) COPIES OF THE PLEADING PER PARTY TO BE SERVED |

CASE NUMBER: _____    CURRENT COURT: _____

**TYPE OF INSTRUMENT TO BE SERVED** (See Reverse For Types): Plaintiff's Original Petition and Application to Compel Arbitration

**FILE DATE OF MOTION:** November 4, 2016 _____

Month/          Day/          Year

**SERVICE TO BE ISSUED ON** (Please List Exactly As The Name Appears In The Pleading To Be Served):

**1.** NAME: United Energy Group Limited

ADDRESS: Rm 12, 21/F, Two Pacific Place, 88 Queensway, Hong Kong and/or Clarendon House, 2 Church Street, Hamilton HM111, Bermuda

AGENT, (if applicable): _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): _____

**SERVICE BY** (check one)
- X   **ATTORNEY PICK-UP**            ☐ **CONSTABLE**
- ☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: _____   Phone: _____
- ☐ **MAIL**                              ☐ **CERTIFIED MAIL**
- ☐ **PUBLICATION:**
    Type of Publication:    ☐ **COURTHOUSE DOOR,  or**
                                      ☐ **NEWSPAPER OF YOUR CHOICE:** _____
- ☐ **OTHER,** explain _____

**ATTENTION:  Effective June1, 2010**
**For all Services Provided by the DISTRCT CLERKS OFFICE requiring our office to MAIL something back to the Requesting Party, we require that the Requesting Party provide a Self-Addressed Stamped Envelope with sufficient postage for mail back.  Thanks you,**

*****************************************************************************************************

**2.** NAME: Sean Mueller

ADDRESS: 20 Crestwood Drive, Houston, Texas 77007

AGENT, (if applicable): _____

**TYPE OF SERVICE/PROCESS TO BE ISSUED** (see reverse for specific type): _____

**SERVICE BY** (check one)
- X   **ATTORNEY PICK-UP**            ☐ **CONSTABLE**
- ☐ **CIVIL PROCESS SERVER -** Authorized Person to Pick-up: _____   Phone: _____
- ☐ **MAIL**                              ☐ **CERTIFIED MAIL**
- ☐ **PUBLICATION:**
    Type of Publication:    ☐ **COURTHOUSE DOOR,  or**
                                      ☐ **NEWSPAPER OF YOUR CHOICE:** _____
- ☐ **OTHER,** explain _____

**ATTORNEY (OR ATTORNEY'S AGENT) REQUESTING SERVICE:**

NAME:  Michael D. Sydow   TEXAS BAR NO./ID NO.  19592000

MAILING ADDRESS:  5020 Montrose Boulevard, Suite 450, Houston, Texas 77006

PHONE NUMBER:  (713) _____        622-9700        FAX NUMBER:  (713) _____        552-1949

area code        phone number                                    area code        fax  number

EMAIL ADDRESS:  michael.sydow@thesydowfirm.com _____

S:\FormsLib\Civil Bureau\Civ Fam Intake & Customer Svc\Civintake\Civil Process Request Form                                    Rev. 5/7/10

Certified Document Number: 72606326 - Page 1 of 1



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606326 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

2016-76737 / Court: 157

# Exhibit 1:

# Arbitration Agreement

Certified Document Number: 72606318 - Page 1 of 7

## INDEMNITY AND RELEASE AGREEMENT

This Indemnity and Release ("**Agreement**") is made and entered into as of this 12th day of March, 2012, by and between United Energy Group Limited ("UEG") and International Energy Ventures Management, LLC ("IEVM") and the principals of IEVM, Graham Livesey ("Livesey"), Michael Francisco ("Francisco") and Daniel Hughes ("Hughes"), where IEVM, Livesey, Francisco and Hughes are collectively referred to as Released Parties.

## R E C I T A L S

WHEREAS, UEG has acquired oil and gas properties from BP Pakistan (Badin), Inc, and other BP subsidiaries with oil and gas properties in Pakistan ("BP"); and

WHEREAS, the Released Parties introduced UEG to BP and acted as facilitator and were retained by UEG as consultant to assist in the purchase in such properties by UEG; and

WHEREAS, during such time when the Released Parties acted as consultant to UEG the Released Parties were not paid for such services rendered but were to be paid following the closing of the purchase of such properties from BP, and;

WHEREAS, prior to the purchase of such properties, UEG conducted its own due diligence and the Released Parties made no representations or warranties to UEG with respect to the properties purchased by UEG, and;

WHEREAS, closing on such transaction occurred in September 2011 and following such closing of such properties UEG has reason to believe the reserves associated with such properties are significantly less than what it had believed them to be, and;

WHEREAS, UEG has requested the Released Parties to again assist it as consultant with respect to these properties as UEG conducts further review of the property purchased by UEG, and;

WHEREAS, litigation may ensue as a result of the quantities of the reserves reported, and;

WHEREAS, the Released Parties agree to again act as a consultant to UEG with respect to the reserve issue identified by UEG but only if (i) UEG shall pay the Released Parties fees and expenses, all as provided in Article 1 of this Agreement and (ii) UEG releases the Released Parties from any claim with respect to any issue arising out of or related to the purchase of the oil and gas properties from BP, other than in circumstances of gross negligence as defined in Article 4 of this Agreement and (iii) UEG indemnifies the Released Parties from any claim which may arise out of or relate to such purchase and sale

WHEREAS, the parties have agreed to such terms.

Certified Document Number: 7260318 - Page 2 of 7

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, UEG and the Released Parties, intending to be legally bound, do hereby agree as follows:

1.  **Consultancy.**  The Released Parties agree to provide services to UEG as requested and United Energy Pakistan Limited ("UEP")  shall pay the Released Parties for such services at the Released Parties normal rate of US$ 1,750 per consultant per day, or any portion of any day worked and pay the expenses incurred during such services within 10 (ten) business days of receiving invoices therefore but contingent on the following conditions:

    (a)     If DeGolyer and MacNaughton Canada Limited ("D&M") completes its review of reserves and produces a reserves report with a minimum reserve level of 55mmboe on or by March 13, 2012, the fee paid to the Released Parties for the services rendered under this Agreement shall be either US$ 30,000 or actual accrued fees calculated according to the Released Parties normal rate above, whichever number is greater. In other words, if the above conditions are met, the Released Parties would be eligible to the performance bonus paid on the top of accrued fees, if such fees are below US$ 30,000.

    (b)     If D&M were unable to produce a reserves report with a minimum reserve level of 55mmboe on or by March 13, 2012, the fee paid to the Released Parties for the services rendered only under this Agreement will be the Released Parties' normal rate but capped to US$ 15,000.

2.  **Indemnity.**  UEG agrees the Released Parties were not responsible for any of the due diligence surrounding the purchase of the oil and gas properties by UEG from BP nor did the Released Parties make any representation to UEG with respect to the oil and gas properties. Consequently, the Released Parties shall  not be liable or responsible for, and UEG herby agrees to and shall indemnify, defend, protect, save and hold harmless the Released Parties from and against, any and all suits, actions, demands, losses, damages, claims, or liabilities of any character, type, or description, including without limitation all expenses of litigation, court costs, and attorney's fees, for any claim which may be brought by  BP or any other third party, arising out of, or related to, directly or indirectly, the  purchase  and  sale  of  the  oil  and  gas  properties  by  and  between  UEG  and  BP.

    **IT IS THE EXPRESSED INTENT OF THE PARTIES TO THIS AGREEMENT THAT THE INDEMNITY PROVIDED FOR IN THIS SECTION IS AN INDEMNITY EXTENDED BY UEG TO, AMONG OTHER THINGS, INDEMNIFY AND PROTECT THE RELEASED PARTIES FROM ANY COUNTERCLAIM THAT BP OR ANY THIRD PARTY MAY ASSERT AGAINST UEG AND ITS CONSULTANTS WHICH INCLUDES THE RELEASED PARTIES WITH RESPECT TO THE PURCHASE BY UEG OF BP'S OIL AND GAS PROPERTIES AND THE RESERVES ASSOCOCIATED WITH SUCH SALE.**

3.  **Waiver, Release and Covenant Not to Sue**. UEG  hereby releases and discharges the Released Parties from, waive any and all claims, actions and/or causes of action that UEG

has or may hereafter have against the Released Parties for, and covenant not to sue the Released Parties for, any and all claims, damages, obligations, losses, demands, injuries, costs, expenses (including without limitation attorneys' fees), and/or liabilities, of any kind or character, whether direct or indirect, anticipated or unanticipated, known or unknown, disclosed or undisclosed, or matured or unmatured, resulting from and/or arising out of the purchase by UEG of the oil and gas properties from BP and, in particular, the performance or nonperformance of the Released Parties associated with such acquisition.

4.   **EXPRESS NEGLIGENCE. THE INDEMNIFICATIONS, RELEASE, AND COVENANT NOT TO SUE PROVISIONS PROVIDED IN THIS AGREEMENT SHALL BE APPLICABLE WHETHER OR NOT THE CLAIMS, LOSSES, COSTS, EXPENSES, DAMAGES AND/OR LIABILITIS IN QUESTION AROSE OR ARE ALLEGED TO HAVE ARISEN SOLELY OR IN PART FROM THE ACTIVE, PASSIVE, OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF THE RELEASED PARTIES. THE PARTIES ACKNOWLEDGE THAT THIS STATEMENT AND EACH INDEMNIFICATION, RELEASE, WAIVER AND COVENANT NOT TO SUE HEREIN COMPLY WITH THE EXPRESS NEGLIGENCE RULE AND ARE CONSPICUOUS.**

5.   **Past Services.** UEG acknowledges that the Released Parties did provide valuable services with respect to the subject purchase and sale by and between UEG and BP. UEG further acknowledges that payment for such services has not been paid by UEG. Further, UEG represents to the Released Parties that the work associated with the additional services requested of the Released Parties by UEG does not alter nor replace the amount due the Released Parties from the prior work done.

6.   **Governing Law, Arbitration.** This Agreement shall be governed by and interpreted by the laws of the state of Texas. Any controversies arising out of this Agreement or its interpretation shall be settled by a single arbitrator in Houston, Texas in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

7.   **No Strict Construction.** The language used in this Agreement is chosen jointly by the parties to express their mutual intent and no rule of construction will be applied against any party, including any rule of draftsmanship. The parties hereby expressly agree that any uncertainty or ambiguity existing herein shall not be interpreted against any of them. Except as expressly limited by this paragraph, all of the applicable rules of interpretation of contract shall govern the interpretation of any uncertainty or ambiguity. The term "including" as used in this Agreement is used to list items by way of example and shall not be deemed to constitute a limitation of any term or provision contained herein.

8.   **Invalidity.** If any term or provision of this Agreement shall be determined to be unenforceable or invalid or illegal in any respect, the unenforceability, invalidity or illegality shall not affect any other term or provision of this Agreement, but this Agreement shall be construed as if such unenforceable, invalid or illegal term or

Indemnity Agreement
Page 3 of 5

Certified Document Number: 7260631 8 - Page 4 of 7

provision had never been contained herein.

9.     **No Oral Modifications.** This Agreement may not be modified, amended or terminated orally. No modification, amendment or termination, or any waiver of any of the provisions of this Agreement, shall be binding unless same is in writing and signed by the person against whom such modification, amendment or waiver is sought to be enforced.

10.    **No Waiver.** The failure of any of the parties to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof or any right of any person thereafter to enforce each and every provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other breach.

11.    **Successors and Assigns.** This Agreement shall be binding upon UEG and UEG's successors and assigns and shall inure to the benefit of the Released Parties and be enforceable by their affiliates, successors and assigns.

12.    **Section Numbers and Headings.** Section numbers and section titles have been set forth herein for convenience only, and they shall not be construed to limit or extend the meaning or interpretation of any part of this Agreement.

13.    **Entire Agreement.** This Agreement contains the entire agreement of the parties with respect to the subject matter herein, and supersedes all prior negotiations, agreements and understandings with respect thereto; provided, however this Agreement does not supersede, but is a supplement to, the agreement with respect to the prior work completed by the Released Parties for UEG.

14.    **Power and Authority.** Each party represents and warrants that it has the full power and authority to execute and deliver this Agreement and to perform the obligations hereunder and the person executing this Agreement on behalf of each party represents and warrants that he/she has the full power and authority to bind such party.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

**United Energy Group Limited**

_____
Rachel Zhang, Executive Director

**International Energy Ventures Management, LLC.**

_____                    _____
Graham Livesey                                      Michael Francisco

_____
Daniel Hughes

Certified Document Number: 7260618 - Page 6 of 7

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

**United Energy Group Limited**

Rachel Zhang, Executive Director

**International Energy Ventures Management, LLC.**

Graham Livesey

Michael Francisco

Daniel Hughes

Indemnity Agreement
Page 5 of 5

Certified Document Number: 72606318 - Page 7 of 7



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017


Certified Document Number:      72606318 Total Pages:  7


Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS


**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

2016-76737 / Court: 157

# Exhibit 2:

# Draft IEVM-UEG finder's fee and consulting agreement

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding (this **"MOU"**) is made this [___] day of September, 2010 among **[China Orient Entity]** (**"China Orient"**), International Energy Venture Management LLC (**"IEVM"**), Ping Chen (**"Chen"**) and Sean Mueller (**"Mueller"**).

### Recitals

China Orient, IEVM, Chen and Mueller (collectively, the **"Parties"** and individually, a **"Party"**) wish to work together to evaluate submitting a bid to acquire certain assets owned by subsidiaries of BP plc located in Pakistan (the **"BP Pakistan Assets"**).

This MOU is being executed by the Parties to evidence certain agreements among the Parties concerning the evaluation and possible acquisition of the BP Pakistan Assets.

NOW THEREFORE, in consideration of the premises and the mutual agreements herein contained and desiring to be legally bound, the Parties hereby agree as follows:

1.     China Orient shall be solely responsible for determining whether to submit a bid for the BP Pakistan Assets and the amount and terms of any bid that is to be submitted. IEVM shall assist China Orient in its technical evaluation of the BP Pakistan Assets and Chen and Mueller shall assist China Orient in its financial evaluation of the BP Pakistan Assets and in respect of the structural aspects of any bid. China Orient shall be responsible for its own expenses in respect of evaluating the BP Pakistan Assets and structuring a bid for the BP Pakistan Assets and shall reimburse IEVM, Chen and Mueller for their reasonable out-of-pocket costs and expenses, including travel costs and expense. China Orient shall also fund the costs of third party advisors, including legal, tax and accounting and technical advisors, retained in connection with the evaluation and bid, up to a maximum commitment of US$[_____].

2.     The BP Pakistan Assets shall be acquired through an entity (**"Acquisition Co"**) which shall be formed for the purpose of the acquisition. The entity form and jurisdiction of formation of Acquisition Co will be selected so as to maximize the tax efficiency of the acquisition for all of the equity holders in Acquisition Co and the ability of the Parties to implement the other terms of this MOU.

3.     Acquisition Co shall have two classes of equity interests as follows:

A.     Acquisition Co's Class A Equity Interests, which shall initially be held by China Orient, shall entitle the holders to 100% of all distributions in respect of the equity of Acquisition Co on a preferred basis until the earlier to occur of the date (the **"Back In Date"**) on which (i) the Class A Equity Owners have received aggregate distributions equal to the Initial

Certified Document Number: 72606319 - Page 2 of 4

Contributed Capital (as defined below), or (ii) a Liquidity Event, as defined below, occurs, and thereafter, to 94% of all distributions in respect of the equity of Acquisition Co. For purposes of this MOU, a "Liquidity Event" shall occur upon (i) the public or private sale by Acquisition Co or any subsidiary of Acquisition Co of equity securities at a price which implies an equity valuation of the Class A Equity Interests in Acquisition Co that equals or exceeds a multiple of [**1.5**] times the Initial Contributed Capital, or (ii) the sale of Class A Equity Interests by China Orient or any affiliate of China Orient to a non-affiliate for aggregate consideration that equals or exceeds the difference between the Initial Contributed Capital and the amount of distributions previously received by China Orient or its affiliates in respect of the Class A Equity Interests.

B.   Acquisition Co's Class B Equity Interests shall not be entitled to share in distributions in respect of the equity of Acquisition Co until the occurrence of the Back-In Date, and after the occurrence of the Back-In Date shall be entitled to receive 6% of all distributions in respect of the equity of Acquisition Co. Acquisition Co's Class B Equity Interests shall initially be held 1/3 by IEVM, 1/6 by each of Chen and Mueller and 1/3 by such other persons as may be designated by Chen and Mueller (the "**Other Class B Equity Interest Owners**"). The Class B Equity Interests held by any person may, at the election of such person, be converted into Class A Equity Interests at any time following the Back-In Date or in connection with the consummation of a Liquidity Event.

4.   China Orient shall be solely responsible for the capitalization of Acquisition Co and the funding of the purchase price for the BP Pakistan Assets to the extent that the purchase price is not funded through debt incurred by Acquisition Co (the capital contributed to Acquisition Co to fund the purchase price of the BP Pakistan Assets being referred to as the "**Initial Contributed Capital**"). The Class B Equity Interests of IEVM, Chen, Mueller and the Other Class B Equity Owners shall be issued in exchange for the services provided by such Class B Equity Owners in the evaluation of the BP Pakistan Assets and the preparation of the bid for such assets. China Orient shall indemnify and hold each of IEVM, Chen, Mueller and the Other Class B Equity Owners harmless from any liability in respect of the purchase of the BP Pakistan Assets, including any liability as a result of the failure of Acquisition Co to close and fund the acquisition.

5.   Acquisition Co shall be managed by the Class A Equity Interest Owners, and the Class B Equity Interests shall not be entitled to any vote, except as required by law, provided, however, that the following actions shall require the prior consent of simple majority of the Class B Equity Interests, voting as a class: (i) any merger, consolidation, recapitalization or other fundamental change in structure or capitalization of Acquisition Co, (ii) any issuance of equity interests which would have the effect of diluting the interests of the Class B Equity Interest Owners below 6% following the Back-In Date, (iii) any material transaction between Acquisition Co and China Orient or an affiliate of China Orient, and (iv) [**others to be discussed**]. The parties recognize that

Certified Document Number: 72606319 - Page 3 of 4

a public offering of equity securities of Acquisition Co is likely to require a reorganization of Acquisition Co and the Class B Equity Interest Owners agree to cooperate with the Class A Equity Interest Owners in respect to any such reorganization provided that the reorganization does not disproportionately prejudice the interests of the Class B Equity Interest Owners as a class. The Parties also agree that China Orient shall be entitled to drag along rights in connection with the sale of all of its Class A Equity Interests and the holders of the Class B Equity Interests shall be entitled to tag along rights in connection with the sale of 50% or more of the Class A Equity Interests.

6.      Following the closing of the acquisition of the BP Pakistan Assets by Acquisition Co, IEVM shall cause [**Hughes, Livesey and Francisco**] to enter into employment agreements with Acquisition Co or an affiliate of Acquisition Co at agreed levels of compensation and otherwise on industry standard terms to assist Acquisition Co in the development of the BP Pakistan Assets.

7.      In consideration of the significant expense and effort that each Party will expend in evaluating the BP Pakistan Assets and in preparation of a bid for the BP Pakistan Assets, the Parties agree that they or any of their respective affiliates, and their and their or their affiliates' officers, directors and principal shareholders will participate in a bid for the BP Pakistan Assets only as provided in this MOU.

In Witness Whereof, the Parties have caused this MOU to be duly executed as of the date first above written.


**[China Orient Entity]**

Ping Chen

By:_____
Its:_____

International Energy Ventures
Management LLC

Sean Mueller

By:_____
Its:_____

Certified Document Number: 72606319 - Page 4 of 4



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606319 Total Pages:  4

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

2016-76737 / Court: 157

# Exhibit 3:

## Sept. 18, 2010 Email from Tom Moore of Dewey & LeBoeuf

## Michelle Hernandez

| | |
|---|---|
| **From:** | Dhughesgeo@aol.com |
| **Sent:** | Saturday, September 18, 2010 11:32 AM |
| **To:** | mickf@att.net; grahaml@ix.netcom.com |
| **Subject:** | Fwd: CG MOU |

Mick and Graham,

That would be 8 am Houston time, 7 am Denver time tomorrow. That works for me. Graham says its ok with him. Mick, can you confirm?  and Mick, let's talk later today..

Dan

---

From: TMoore@deweyleboeuf.com
To: Dhughesgeo@aol.com
CC: mickf@att.net, grahaml@ix.netcom.com, sean.mueller@muellerco.pro, peterc9999@gmail.com
Sent: 9/18/2010 2:23:06 A.M. Mountain Daylight Time
Subj: RE: CG MOU

I think a call with Ping and Sean would be very helpful.  In the mean time, here is the current state of play:

1. At the closing of the acquisition, IEVM will get equity in the acquisition vehicle that will equate to 2% of the equity value of the company after the first to occur of the following:

A. China Orient received total distributions equal to the equity component that it funded of the purchase price;
B. There is a sale of securities by the acquisition vehicle that values China Orients interest in the acquisition vehicle at 1.5 times China Orient's initial capital investment; or
C. China Orient sells down its interest in the acquisition vehicle and receives proceeds which, when added to any distributions it has received, equals its initial capital investment.

As an illustration, assume that the purchase price is $1 billion, and it is funded with $300 million of equity contributed by China Orient and $700 million of debt incurred by the acquisition vehicle.  IEVM's equity interests would not be entitled to share in distributions until (A) China Orient had received distributions of $300 million, (B) there was an IPO or stock sale that valued the equity of the acquisition vehicle at $450 million (or an enterprise valuation of $1.15 billion), or (C) Clina Orient received $300 million from the sale of all or part of its equity and/or distributions.  ("B" is not exact because the test is the valuation of China Orient's equity.  However, since China Orient owns at least 96% of the equity, it is a close approximation.)

The most likely event is (B).  Assume that there is an IPO 1n a year that values the acquisition vehicle at $2 billion.  This would imply an equity valuation of $1.3 billion (after accounting for the debt).  2% of that valuation would be $26 million.

It is important to recognize that the IEVM equity has a value even before the above thresholds are met since it is issued at the closing and represents a right to participate if and when the tests are met.

I hope that this is helpful.

---

Thomas J. Moore
Partner
Dewey & LeBoeuf LLP
tmoore@dl.com
www.dl.com

Certified Document Number: 72606320 - Page 2 of 2

1



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606320 Total Pages:  2

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

2016-76737 / Court: 157

# Exhibit 4:

## UEG Sept. 7, 2010 Letter to BP

Certified Document Number: 72606321 - Page 1 of 3



东方集团
ORIENT GROUP

中国·北京市东城区朝阳门北大街3号第五广场A座18层 邮编: 100010
电话: 0086-10-64088989    传真: 0086-10-64088918
网址: www.china-orient.com

中国·黑龙江省哈尔滨市南岗区花园街235号 邮编: 150001
电话: 0086-451-53821457    传真: 0086-451-53666017

September 7, 2010

Dear Mr. Steven Riney:

I am pleased to inform you of our interest in your Pakistan company and assets.    The purpose of this letter is to formally introduce our interest and present our credentials.

I am the Chairman of China Orient Group/United Energy Group, which is one of the largest non-state-owned investment conglomerates in China.    Among other assets, we own three publicly traded companies in Mainland China and Hong Kong: Orient Group Ltd (Shanghai SE - 600811) 2), Jinzhou Port (Shanghai SE– 600190) and United Energy Group (HKSE– 00467). We are the owner of the leading construction materials and home improvement retailer chain in China.    We are also the leading shareholder of the two largest financial institutions in China:    Haitong Securities Ltd, (Shanghai SE- 600837), the second largest investment banking firm in China with market cap of RMB￥81 Billion/USD $12 billion, and MinSheng Bank (Shanghai SE– 600016, HKSE - 001988), the largest non-state-owned bank in China with RMB1.5 trillion asset.

In the past Oriental Group/United Energy Group has entered into joint ventures with CNPC/PetroChina in Enhanced Oil Recovery Development (EOR) .    We continue to have a great relationship with CNPC/PetroChina and they are very supportive of our initiative to purchase your Pakistan assets and will provide further technical and operational assistance to our efforts.

In this effort to secure your Pakistan assets, China Orient Group/United Energy Group has partnered with the former management of Union Texas and Orient Petroleum. We have the technical team in place that can understand your assets and in particular the value of your upside.

We fully believe that we are among the most suitable and qualified potential buyers for your BPP asset and we are truly interested in an opportunity to evaluate your asset to facilitate a bidding proposal.

Certified Document Number: 7260632I - Page 2 of 3



东方集团
ORIENT GROUP

中国·北京市东城区朝阳门北大街3号第五广场A座18层 邮编: 100010
电话: 0086-10-64088989    传真: 0086-10-64088918
网址: www.china-orient.com

中国·黑龙江省哈尔滨市南岗区花园街235号 邮编: 150001
电话: 0086-451-53621457    传真: 0086-451-53666017

I would be more than pleased to enter into a confidentiality agreement to further pursue the opportunity.

We look forward to working with you on this important initiative.

Sincerely yours,

Hong Wei Zhang

Chairman of the China Orient Group
Chairman of the United Energy Group



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017


Certified Document Number:        72606321 Total Pages:  3


Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS


**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

2016-76737 / Court: 157

# Exhibit 5:

UEG Sept. 20, 2010 Letter to BP

Certified Document Number: 72606322 - Page 1 of 6



聯合能源集團有限公司
**UNITED ENERGY GROUP LIMITED**

香港：香港金鐘道88號太古廣場2座2112號
電話：852-25228287 傳真：852-25226938
Rm.2112, Two Pacific Place, 88 Queensway, Central HongKong
Tel: 852-25228287 Fax: 852-25226938

September 20, 2010

Dear Mr. Coleman,

Further to our initial letter of interest, this letter serves to more formally introduce our team and our qualifications in purchasing your oil and gas assets in Pakistan.   As you will see below, we have followed your outline of questions you proposed.   In addition to this letter, we have also included an executed copy of the Confidentiality Agreement with no changes.

**a)   Your experience in oil and gas assets comparable with the size and scope of BP Pakistan**

The United Energy Group Limited owns and operates an Enhanced Oil Recovery Project in Panjin City, Liaoning Province, China.   Our Joint Venture partner in the project is PetroChina Company Limited ("PetroChina").   The original oil in place ("OOIP") within the Project is approximately 630 MMBO.   We estimate first year's production to be 2 MMBO with strong projected growth over the ensuing next years.

Further, the United Energy Group Limited owns and operates two exploration and development blocks in Indonesia with estimated natural gas reserves of 530 Bcf and oil reserves of 33 MMBO. We are partnered with PetroChina in this project as well.   We     are currently in the appraisal phase.

The United Energy Group Limited's management team and technical team are primarily former PetroChina and Union Texas Pakistan senior management and technical personnel.   The average work experience of our key management is more than 30 years.

**b)   Your operatorship experience, if any, within or outside Pakistan in assets of the size and scope of BP Pakistan**

Three of our team members were senior executives with Union Texas Pakistan and Orient Petroleum who worked the BP Pakistan assets through the entire cycle of bidding, drilling, exploration, and exploitation.

Our team members' activities with the BP Pakistan oil and gas assets are as follows:

1.  Drilling and production engineering during initial Badin discoveries and development.

2.  Badin operations management during expansion into gas production and outlying oil development.

3.  Development and implementation of the safety and environmental management system currently in use.

4.  Development and implementation of a program to investigate and if necessary remediate any environmental concerns from historical Badin drilling activities.

5.  Development, and governmental approval and implementation of a Mirpur Khas/Khipro Integrated Drilling Management Project for 19 wells – the first ever in Pakistan.

6.  Planning and acquisition of 2D and 3D seismic programs over Mirpur Khas/Khipro, geological and geophysical mapping and generation of the 19 well exploration program.

7.  Throughout the involvement in Badin and Mirpur Khas/Khipro, represented Union Texas, Orient Petroleum, and Bow Energy Resources at Technical and Operational Committee Meetings held with DGPC (Directorate General Petroleum Concessions).

**c)   Details of your existing Pakistan relationships, investments or assets**

Our company's effort is fully encouraged and supported by the government of China. Historically, Pakistan and China have good, close relations.

China–Pakistan good relations began in 1950 when Pakistan was among the first countries to break relations with the Republic of China on Taiwan and recognize the PRC. Following the 1962 Sino-Indian War, Pakistan's relations with the PRC became stronger.  Since then, the two countries have regularly exchanged high-level visits resulting in a variety of agreements. Pakistan had earlier played a leading role in bridging the communication gap between China and the West, through Henry Kissinger's secret visit before the 1972 Nixon visit to China.

Favorable relations with China have been a pillar stone of Pakistan's foreign policy. China has been perceived by Pakistan as a regional counterweight to India.  Chinese cooperation with Pakistan has reached high economic points with substantial investment from China in Pakistani infrastructural expansion, including the noted project in the Pakistani deep water port in Gwadar. Both countries have an ongoing free trade agreement.  Pakistan has served as China's main bridge between Muslim countries, with the two countries maintaining high level economic, military, commercial, technical and investment exchanges.  The relationship has been recently described by China's president Hu Jintao as "higher than the mountains and deeper than oceans."

**d)   Your level of interest with respect to the onshore and offshore assets separately and together**

We have a strong interest in all the BP Pakistan oil and gas assets and related assets, to include

2

both the onshore and offshore acreage.

e) **Your capacity to fund the Proposed Transaction with details of whether the funds will be arranged from within the organization or through financiers. If through financiers, names of such financiers and details around potential structure of the financing if available**

The United Energy Group Limited is prepared to sign the definite purchase agreement without any financing contingencies.

f) **Confirmation of any partnerships or consortia with other financial sponsors and / or industrial partners and / or other parties in relation to the Proposed Transaction. If you intend to be part of a partnership or consortia, you will need to provide details as to the identity of each member and information as requested in a) through i) for each member; in addition, please be aware that any future changes to consortia members will not be accepted unless otherwise authorized by BP**

The United Energy Group Limited will be solely responsible for the valuation and due diligence effort, and ultimately, submitting a firm proposal.   Certain technical and operational personnel from PetroChina and Union Texas Petroleum have joined the United Energy Group Limited for further support.

g) **Confirm that you will make comparable employment offers to all management and staff involved with BP Pakistan;**

We fully intend to make comparable employment offers to all management and staff involved with BP Pakistan.

h) **Details of your senior team members and the external finance, accounting and legal advisers that you (and your investors and finance providers) envisage being involved in the Proposed Transaction**

Our senior team will be comprised of:

Mr. Zhang Hongwei, Chairman of the United Energy Group Limited

Mr. Zhang has over three decades of business management experience and is currently the Chairman of the Orient Group (SH: 600811) and the United Energy Group (HK:0467).   Further Chairmanships include Vice Chairman of China Minsheng Banking Co., Ltd. (SH: 600016, HK: 1988) and Chairman of Jinzhou Port Co., Ltd. (SH: 600190).   Mr. Zhang is a member of the

Certified Document Number: 72606322 - Page 4 of 6

CPPCC National Committee.   Recently, Mr. Zhang also served as the Vice Chairman of China Federation of Industry and Commerce.

Mr. Huang Yan, Honorary Chairman of United Energy Group Limited, Chief Advisor of the Group

Mr. Huang has 40 years working and management experience in the oil and gas industry. He was the president of PetroChina Company Limited("PetroChina") and the former chairman of the Chinese National Petroleum Society.

Mr. Huang was the representative of China National People's Congress, CPPCC National Committee.  In 2001, he was named by the U.S. "Business Week" as the "Asian Star" to recognize his outstanding performance in listing the PetroChina on NYSE.

Mr. Xu Xiaolu, President of United Petroleum & Natural Gas Investments Limited (Subsidiary of United Energy Group Limited).

Mr. Xu has over 20 years working experience in the oil and gas industry and spent 20 years with PetroChina in senior executive positions.   He was the CEO of the Hong Kong listed CNPC (Hong Kong).   He was instrumental in the CNPC's successful effort in restructuring of CNPC's assets and listing the company on the NYSE in 2000.   Post listing, he served as its head of Investor Relations and the chief representative in Hong Kong.

Mr. Wang Chunpeng, COO of United Energy Group Limited

Mr. Wang has over 35 years experience in oil and gas industry.   He was the head of exploration and development and later the general manager of PetroChina's Liaohe Petroleum Company. Liaohe Field is the third largest oil field in China with annual oil production of 70 MMBO and gas production of 60 Bcf.

Ms. Zhang Meiying, Executive Director of United Energy Group Limited

Ms. Zhang has worked in Citigroup Investment Banking and the China Minsheng Banking Corporation with rich experience in the commercial and investment banking sectors.

Our external consultants will be preliminary comprised of:

| | |
|---|---|
| Legal: | Dewey & LeBeouf |
| Reserves: | Degolyer & McNaughton |
| Tax and Structuring: | Ernst & Young |

This team has worked on numerous transactions in the past and are well prepared to move forward expeditiously on this project.

4

**i)** **Your principal point of contact for all communications in relation to the Proposed Transaction**

Sean Mueller
+1 713 397 7585
sean.mueller@muellerco.pro

Ping Chen
+86 1391 1234510
pchen@cippartners.com
peterc9999@gmail.com

We sincerely look forward to working with BP on this important project.   If you have any further questions, please do not hesitate to reach out to us immediately.

Best regards,

Xu Xiaolu, President of United Petroleum & Natural Gas Investments Limited (Subsidiary of United Energy Group Limited)

5



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:      72606322 Total Pages:  6

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

# Exhibit 6:

## UEG business cards issued to IEVM

Certified Document Number: 72606323 - Page 1 of 4

Certified Document Number: 72606323 - Page 2 of 4



# UNITED ENERGY GROUP LIMITED

UNITED PETROLEUM & NATURAL GAS INVESTMENTS LIMITED
(Hong Kong Stock Exchange Listed Company Code: 467)

**Dan Hughes**
Senior Consultant

Suites 2505, 25/F, Two Pacific Place, 88 Queensway, Admiralty, Hong Kong

Tel:          (852) 2522 8287          Fax: (852) 2522 6938
Mobile:  +1 281 389 8590
E-mail:   dhughesgeo@aol.com
Website: www.uegl.com.hk



**UNITED ENERGY GROUP LIMITED**

UNITED PETROLEUM & NATURAL GAS INVESTMENTS LIMITED
(Hong Kong Stock Exchange Listed Company Code: 467)

Michael S. Mick Francisco
Senior Consultant

Suites 2505, 25/F, Two Pacific Place, 88 Queensway,
Admiralty, Hong Kong
Tel:       (852) 2522 8287          Fax: (852) 2522 6938
Phone:   +1 713 3012216
E-mail:   mickf@att.net
Website: www.uegl.com.hk



**聯合能源集團有限公司**

聯合石油天然氣投資有限公司
(香港聯合交易所上市公司代碼467)

范思銘
高級僱問

香港金鐘金鐘道88號太古廣場2座25樓05室
電話: (852) 2522 8287          傳真: (852) 2522 6938
手提: +1 713 3012216
電郵: mickf@att.net
網址: www.uegl.com.hk

Certified Document Number: 72606323 - Page 3 of 4



聯合石油天然氣投資有限公司
(香港聯合交易所上市公司代碼:467)

李仕冠
高級偏問

香港金鐘金鐘道88號太古廣場2座25樓05室
電話: (852) 2522 8287　　傳真: (852) 2522 6938
手提: +1 713 806 1673
電郵: grahaml@ix.netcom.com
網址: www.uegl.com.hk



### UNITED ENERGY GROUP LIMITED

UNITED PETROLEUM & NATURAL GAS INVESTMENTS LIMITED
(Hong Kong Stock Exchange Listed Company Code: 467)

Graham Livesey
Senior Consultant

Suites 2505, 25/F, Two Pacific Place, 88 Queensway,
Admiralty, Hong Kong
Tel:　(852) 2522 8287　　Fax: (852) 2522 6938
Mobile:　+1 713 806 1673
E-mail:　grahaml@ix.netcom.com
Website: www.uegl.com.hk

Certified Document Number: 72606323 - Page 4 of 4



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606323 Total Pages:  4

Chris Daniel, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

2016-76737 / Court: 157

# Exhibit 7:

## Affidavit of Graham Livesey

Certified Document Number: 72606324 - Page 1 of 4

CAUSE NO. _____

| | | |
|---|---|---|
| INTERNATIONAL ENERGY VENTURES MANAGEMENT, L.L.C. | § § § | IN THE DISTRICT COURT OF |
| Plaintiff | § § | |
| V. | § § § | HARRIS COUNTY, TEXAS |
| UNITED ENERGY GROUP, LIMITED and SEAN MUELLER | § § § | _____ JUDICIAL DISTRICT |
| Defendants | § | |

## <u>AFFIDAVIT OF GRAHAM B. LIVESEY</u>

STATE OF TEXAS        §
                                          §
COUNTY OF HARRIS    §

BEFORE ME, the undersigned authority, personally appeared Graham B. Livesey who, being by me duly sworn, deposed and said:

1.      My name is Graham B. Livesey.  I am over 18 years of age, of sound mind, and fully competent to give this affidavit.  The statements set forth in this affidavit are true and correct and are based on my personal knowledge.

2.      I am the President of International Energy Ventures Management, LLC ("IEVM") and have served in that capacity since 2006.

3.      Attached as Exhibit 1 to Plaintiff's Original Petition and Application to Compel Arbitration is a true and correct copy of the Indemnity and Release Agreement dated March 12, 2012 by and among United Energy Group Limited, and IEVM, me, Michael Francisco, and Daniel Hughes (the "Supplemental Agreement").

Certified Document Number: 72606324 - Page 2 of 4

4.     At the time the Supplemental Agreement was made, a controversy existed between the parties regarding, among other things, the amounts owed by UEG to IEVM for the services IEVM provided relating to the sale from BP to UEG of oil and gas assets in Pakistan, including for the "Past Services" referenced in paragraph 5 and other paragraphs of the Supplemental Agreement.   At the time the parties entered into the Supplemental Agreement, and before then, IEVM had demanded that UEG pay it the amounts owed.   UEG consistently refused to pay IEVM for the services provided.

5.     I am a custodian of records for the records of IEVM, including those relating to IEVM's services to UEG.  I am familiar with the manner in which IEVM's records are created and maintained by virtue of my duties and responsibilities.  Attached hereto as Exhibits 1 through 6 to Plaintiff's Original Petition and Application to Compel Arbitration are 20 pages of records from IEVM's files relating to IEVM's services to UEG.   The records attached hereto are the original records or exact duplicates of the original records. The records were made at or near the time of each act, event, condition, opinion, or diagnosis set forth.   The records were made by, or from information transmitted by, persons with knowledge of the matters set forth. The records were kept in the course of regularly conducted business activity. It is the regular practice of the business activity of IEVM to make the records.

[rest of page left intentionally blank]

SIGNED this _3rd_ day of November, 2016.

_Graham B. Livesey_
Graham B. Livesey

SUBSCRIBED AND SWORN TO BEFORE ME on November _03rd_, 2016,

certify which witness my hand and official seal.

_M. d Boado_
Notary Public

> MICHELLE BOADO
> Notary ID # 128967885
> My Commission Expires
> April 25, 2020
> NOTARY PUBLIC STATE OF TEXAS

3



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606324 Total Pages:  4

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

11/4/2016 1:29:17 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 13629697
By: EVANS, BONISHA E
Filed: 11/4/2016 1:29:17 PM

# 2016-76737 / Court: 157

November 4, 2016

The Sydow Firm

5020 Montrose Boulevard
Suite 450
Houston, Texas
77006
713.622.9700 tel.
713.552.1949 fax

**_Via Electronic Filing_**
Mr. Chris Daniel
Harris County District Clerk
201 Caroline
Houston, Texas 77002

      **RE:**    **Notice of Related Case and Request for Assignment to Previous Court**

Dear Mr. Daniel:

    I am writing to notify you that this case is related to a case previously filed in this court: Cause No. 2013-44404; *International Energy Ventures Management LLC v. United Energy Group, LTD and Sean Mueller*; In the 270th Judicial District Court of Harris County, Texas.

    The parties are the same and this suit arises out of the same underlying transactions.

    The 2013 case was removed to federal court. In September 2016, the federal court dismissed the case without prejudice, for lack of jurisdiction.

    Plaintiff respectfully requests that this case be assigned to the 270th Judicial District Court as a related case to the 2013 one.

            Yours very truly,

            Michael D. Sydow

Certified Document Number: 72606327 - Page 1 of 1

*Ltr to Court (110416)*



I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2017

Certified Document Number:        72606327 Total Pages:  1

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**